THOMAS P. DILLON, JR., & others[1] *vs.* MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY.

No. 98-P-1115.

Suffolk. December 17, 1999. - June 2, 2000.

Present: KASS, KAPLAN, & GELINAS, JJ.

*Eavesdropping. Massachusetts Bay Transportation Authority. Telephone
Company. Statute,* Construction.

This court concluded, in the unusual circumstances of the State wiretap statute
having remained without amendment in substantially its present form since
1968, that, in light of the sweeping changes in the telecommunications
industry and the modernizing amendments to the cognate Federal wiretap
statute, 18 U.S.C. §§ 2510-2520, in accordance with which the State
statute is read, the words "communications common carrier" do not mean
literally only telephone companies, but also non-telephone companies that
supply telephone equipment. [313-316]

Certain equipment, used by the Massachusetts Bay Transportation Authority in
the ordinary course of business to record telephone conversations
[319-320], furnished by a commercial equipment manufacturer, and
integrated into the telephone system, was "telephone equipment" and not
an "intercepting device" within the meaning of G. L. c. 272, § 99 B 3
[316-319].

CIVIL ACTION commenced in the Superior Court Department on
September 3, 1996.

Motions for summary judgment were heard by *Herman J.
Smith, Jr.,* J.

*Thomas C. Cameron & Curtis C. Pfunder* for the plaintiffs.

*Gary C. Crossen* for the defendant.

KAPLAN, J. It has been a practice of the Massachusetts Bay
Transportation Authority (MBTA) since at least 1979 to tape

---

[1]Also named as plaintiffs, individually and as class representatives, were
"the members of the Alliance of M.B.T.A. Unions" and "the members of the
Carmen's Union, Local 589," all employees of the Massachusetts Bay
Transportation Authority.

record the conversations on nearly all its telephone lines connected to its major operational centers. On September 3, 1996, the plaintiff Thomas P. Dillon, Jr., and others, MBTA employees, commenced the present class action on behalf of the employees in general, claiming monetary recovery against the defendant MBTA. This was on the theory that the recording of the phone calls encompassed a violation of the Massachusetts wiretap statute, G. L. c. 272, § 99, which as a rule (subject to exceptions and qualifications) denounces secret interceptions. After the close of the pleadings and discovery, the parties cross-moved for summary judgment. Pretermitting the question whether the recording was known to the plaintiff employee class rather than held secret, and was thus wholly outside the statute (see note 4, *infra*), the judge found the practice, even if secret, was lawful upon a proper interpretation of the language of an exception in the statute consistent with its basic regulatory objectives. We agree with the judge, and affirm the judgment for the defendant MBTA.

By way of preface, we shall refer to the relevant statutory terms and note the background facts and particulars of the litigation. Then we deal with the interpretive question.

I. *Prefatory. a.* As reflected in its preamble, the wiretap statute was enacted to give due protection to the privacy of individuals by barring the secret use of electronic surveillance devices for eavesdropping purposes, and at the same time to help in the fight against organized crime by validating the limited and controlled utilization of such devices by law enforcement authorities. § 99 A. The statute prohibits generally the "interception" of wire communications, which includes secret recording by means of an "intercepting device." §§ 99 B, 99 C 1. In turn, an "intercepting device" is defined as

> "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication . . . *other than* any *telephone* or telegraph instrument, *equipment*, facility, or a component thereof, (a) furnished to a subscriber or user by a *communications common carrier* in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business; or (b) being used by a communications common carrier in the ordinary course of its business."

§ 99 B 3 (emphasis added). The words beginning with "other than," often called the "telephone equipment exception," see *O'Sullivan* v. *NYNEX Corp.*, 426 Mass. 261, 262 (1997), act as a limitation on the definition and thus on the statutory prohibition. The judge below concluded that the MBTA recorders were excluded devices under clause (a) of the exception.

*b.* The MBTA is responsible for providing mass transit services to seventy-eight municipalities in eastern Massachusetts. See G. L. c. 161A, §§ 2-3. Its policy of tape recording telephone calls placed to or from the major centers of subway and bus operations was directed to improving efficiency, ensuring public safety, and seeing to employee compliance with applicable law. So, for example, the recordings aim to provide a record of procedures followed during emergencies, to aid accident investigations by internal means as well as by agencies such as the National Transportation Safety Board, and to preserve records of reports of and responses to problems with equipment and facilities. During the three-year period sued for, from September 3, 1993, to September 3, 1996, when the plaintiffs started this action (an arbitrary operational period, but one that harkens to the statute of limitations), there were four critical hubs, the Operations Control Center, the MBTA Police Department, the Maintenance Control Center, and the Power Department, all operating around the clock.

The four recording machines at issue, one per center (two "Dictaphone 5000" units, one "Magnasync 2-4/P-60," one "Lanier Systems"), were of three different commercial makes, but shared certain features. Each was a refrigerator-sized, multichannel apparatus that simultaneously, continuously, and automatically made reel-to-reel tape recordings of all communications on numerous telephone lines while noting time of day.[2] The devices were integrated with the MBTA telephone network by being wired into the telephone junction boxes located at the operational centers. From the junction boxes, the

---

[2]There was one unrecorded telephone line in each of three of the centers designated for use in making outgoing personal calls. The remaining telephone lines servicing the operational centers, approximately fifty in number, were recorded. Some MBTA lines were internal to the MBTA system and could not directly reach outside telephone numbers in the community at large; others were capable of making and receiving external calls.

The recording machines were simultaneously used to monitor MBTA radio transmissions, and in total could record up to twelve radio channels. These radio communications are not an issue in this case.

telephone lines led on to their respective telephone handsets. Each device was furnished by a commercial equipment manufacturer and not a "communications common carrier" as defined in the wiretap statute, § 99 B 12[3] — which in ordinary parlance means a telephone company. (And see the use of these words in the statutory excerpt quoted above.)

The present appellate record provides details of but one recorded call. In early May, 1996, the plaintiff Dillon, a veteran MBTA employee, a supervisor of maintenance personnel, placed a business call from an MBTA telephone located outside an operational center to Joseph Musso, a clerk at the Maintenance Control Center, where the call was recorded without Dillon's knowledge, as he asserts.[4] During the conversation, Dillon used profanity and made disparaging remarks about other MBTA employees. A superior became aware of the conversation (it does not appear how), and she used the recording at a disciplinary hearing that resulted in a written warning to Dillon for inappropriate on-the-job conduct. This lawsuit followed.

*c.* The plaintiffs alleged in their complaint that they had participated in conversations on recorded MBTA phone lines and the MBTA had intercepted these communications without their knowledge or consent in violation of the wiretap statute. On behalf of themselves and the class similarly situated, they prayed for damages under § 99 Q.[5] The MBTA answered denying liability. Discovery followed, focused in large part on

---

[3]"The term 'communications common carrier' means any person engaged as a common carrier in providing or operating wire communicating facilities."

[4]There is no evidence of record that the MBTA attempted to keep its recording practices secret; the available evidence suggests the contrary. For example, the recorders were designed to sound an electronic "beep" on the phone lines at fifteen-second intervals so as to alert users to the recording (although there appears to be a question how audible the beeps were and whether all phone users were aware of their significance). The MBTA utilized union employees to change the tapes on the recording machines, and on occasion the tapes were lent to union members when their contents were relevant to grievances and disciplinary proceedings. At three locations, the recording machines sat in plain view. Additionally, at least some of the personnel training conducted by the MBTA made mention of the recording practices. The plaintiff Dillon also admits that it was common knowledge among MBTA employees that telephone calls involving the Operations Control Center were recorded.

[5]Under G. L. c. 272, § 99 Q, "[a]ny aggrieved person whose oral or wire communications were intercepted, disclosed or used" in violation of the

whether MBTA employees knew of the recording practice through their observations and training or by hearing the warning "beep" tones on particular calls (see note 4, *supra*). Then the plaintiffs, without awaiting class certification, moved for summary judgment as to liability, contending that deposition testimony of an MBTA training official showed that not all employees were notified of the practice and that the beep tones were inadequate notice.[6] The plaintiffs proposed that the court defer the question of which employees were in fact unaware of the recording practice and so, on the plaintiffs' view, would become eventually entitled to damages. Anticipating the MBTA's reliance on the telephone equipment exception, the plaintiffs argued that it did not apply, and that the MBTA was peremptorily liable, for the reason that the devices had not been furnished by a "communications common carrier": the court, they said, need not concern itself with the other aspects of the exception, whether any of the systems constituted "telephone . . . equipment" or whether MBTA made the recordings "in the ordinary course of its business."

In its cross motion MBTA submitted the deposition of Dillon, uncontradicted affidavits of MBTA officials, and answers to the plaintiffs' interrogatories which provided the information about the recording systems summarized above. In a memorandum relying on the *O'Sullivan* case and authority about the corresponding Federal wiretap statute, the judge dealt with the element of the exception that the devices be furnished by a telephone company; he also discussed the other two features of the exception. Judgment entered for the MBTA.

II. *Interpretive. a. "Communications common carrier."*

wiretap statute may recover

> "1. actual damages but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1,000, whichever is higher;

> "2. punitive damages; and

> "3. a reasonable attorney's fee and other litigation disbursements reasonably incurred. . . ."

[6]On the latter point, there was reliance on an opinion of the Attorney General dated April 8, 1982, see Opinion of the Attorney General, Rep. A.G., Pub. Doc. No. 12, at 148, 150-151 (1982), suggesting that an electronic beep in itself might not be sufficient basis for inferring a listener's actual knowledge of recording.

Centering on the language of clause (a), the plaintiffs contended simply that the MBTA devices were not furnished by such a carrier, i.e., a telephone company, and so the exception did not apply. Against this strictly literal reading, the MBTA urges that in enacting the provision many years ago the Legislature could not have foreseen the sweeping changes in the telecommunications industry by which telephone equipment has become widely available from entities other than telephone companies. With this development, MBTA argues, an insistence on words over sense would be preposterous, and in fact the plaintiffs' stance has been rejected.

Our wiretap statute was enacted in substantially its present form in 1968, see St. 1968, c. 738, § 1.[7] It was modeled on the contemporaneous Federal wiretap statute, Pub. L. 90-351, § 802, 82 Stat. 212 (1968), codified at 18 U.S.C. §§ 2510-2520. For this reason of the correspondence of the two statutes, we generally read our statute "in accordance with the construction given the cognate Federal statute by the Federal courts." *O'Sullivan* v. *NYNEX Corp.*, 426 Mass. at 264 n.5. Originally, clause (a) of the telephone equipment exception of our statute was identical with its Federal twin. See 18 U.S.C. § 2510(5)(a)(i), as added by Pub. L. 90-351, § 802, 82 Stat. 212 (1968). In the early 1980's, however, came the break-up of the telephone monopoly of the American Telephone & Telegraph Company and the deregulation of the industry; thereupon a great variety of equipment and services earlier generally provided by a telephone company could be obtained from numerous non-telephone company sources. See *United States* v. *American Tel. & Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982), affd. sub nom. *Maryland* v. *United States*, 460 U.S. 1001 (1983); *State* v. *McVeigh*, 224 Conn. 593, 617-619 (1993); Fishman & McKenna, Wiretapping & Eavesdropping § 2:29 (2d ed. 1995).[8]

Because of this and many other changes in the industrial setting, the Federal statute was recognized to be "hopelessly out

---

[7]The statute has since been amended three times in ways irrelevant to the present case. See St. 1986, c. 557, § 199; St. 1993, c. 432, § 13; St. 1998, c. 163, §§ 7-8.

[8]As this treatise puts it: "By the mid-1980's, telephone companies had lost their monopolies both as to equipment and service. In particular, consumers were able to purchase extension phones and even more sophisticated equipment from a variety of companies, stores, etc. These changes left § 2510(5)(a)(i) obsolete: according to its terms, conduct that was perfectly lawful if done with, for example, an extension phone rented from the telephone

of date," and it was renovated in 1986. See S. Rep. No. 541, 99th Cong., 2d Sess., at 2-3 (1986), reprinted in 1986 U.S. Code Cong. & Admin. News 3555, 3556-3557. See also 132 Cong. Rec. 27,633 (1986). Among other amendments of the statute, Congress modernized the telephone exception by including devices "furnished by [the] subscriber or user for connection to the facilities of [its telephone] service and used in the ordinary course of its business." 18 U.S.C. § 2510(5)(a)(i), as amended by the Electronic Communications Privacy Act of 1986, Pub. L. 99-508, § 101(a)(4), 100 Stat. 1848. See S. Rep. No. 541, 99th Cong., 2d Sess., at 13 (1986), reprinted in 1986 U.S. Code Cong. & Admin. News 3555, 3567.[9]

We do not depart lightly from the express wording of a statute, see *Bartlett* v. *Greyhound Real Estate Fin. Co.*, 41 Mass. App. Ct. 282, 289 (1996), but in the unusual circumstances appearing here we agree with the court below that a deviation is justified. The fact that there has been no amendment of the Massachusetts statute comparable to the Congressional action of 1986 does not bar us from reading the exception so as to preserve it in its intrinsic intended scope and maintain its viability in the broad run of cases; the plaintiffs' proposal would in effect destroy the exception.[10] Thus the decision below comports with the canons that interpretation should

company, violated § 2510(5)(a)(i) if done with an extension phone purchased from Radio Shack, Circuit City, etc."

[9]The current version of the Federal telephone equipment exception now includes:

> "any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business *or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business*; or (ii) being used by a provider of wire or electronic communication service in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties."

18 U.S.C. § 2510(5)(a) (emphasized language added by 1986 amendment).

[10]As supposedly indicating a rejection of the MBTA's position, the plaintiffs point to the Legislature's failure to enact a 1997 bill, Senate Doc. No. 943, which would have excised the words "by a communications common carrier" from clause (a) of the exception. No inference is possible from this negative history; "[t]he fallacy in th[e] argument is that no one knows why the legislature did not pass the proposed measure[]. . . . The practicalities of the

tend to preserve the substance of a statute rather than diminish it, cf. *Bankers Life & Cas. Co.* v. *Commissioner of Ins.*, 427 Mass. 136, 140 (1998); should not override common sense, see *Commonwealth* v. *Dunn*, 43 Mass. App. Ct. 58, 59 (1997); or produce absurd or unreasonable results, see *Attorney Gen.* v. *School Comm. of Essex*, 387 Mass. 326, 336-337 (1982) — in this case the absurdity of allowing the fortuity of the source of the equipment to entail serious material consequences.[11]

The present question of interpretation has arisen elsewhere. The telephone equipment exception in the Connecticut wiretap statute, paralleling the exception in our statute, has been read to embrace devices obtained from non-telephone company sources, despite the lack of an amendment of the law on the lines of the Federal amendment of 1986. See *State* v. *McVeigh*, 224 Conn. at 615-618 (exception extends to wire communications intercepted from telephones obtained from non-telephone company sources: "[w]e decline to read the act so as to have created such a dead zone"); *In re State Police Litigation*, 888 F. Supp. 1235, 1269 (D. Conn. 1995) ("Although the State Wiretap Act has not been amended to clarify that equipment need not be provided by the telephone company, unlike [the Federal statute], the Connecticut Supreme Court has noted that telephone equipment bought from other vendors satisfies the requirement" [footnote omitted], citing the *McVeigh* case). Holding for the MBTA, the judge below said in the same sense: "[T]his court finds that the words 'communications common carrier' . . . should be read in a manner that more closely reflects the reality of the telecommunications industry as it exists today, not as it existed two decades ago."

*b. "Telephone . . . equipment."* To qualify for the exception, the MBTA recorders must be "telephone equipment." In their

---

legislative process furnish many reasons for the lack of success of a measure other than legislative dislike for the principle involved in the legislation." *Franklin* v. *Albert*, 381 Mass. 611, 615-616 (1980), quoting from *Berry* v. *Branner*, 245 Or. 307, 311 (1966).

[11]For examples of the reading of statutory language to avoid untenable results, see *Fred C. McClean Heating Supplies, Inc.* v. *School Bldg. Commn. of Springfield*, 341 Mass. 322, 324 (1960); *Massachusetts Commn. Against Discrimination* v. *Liberty Mut. Ins. Co.*, 371 Mass. 186, 189-190 (1976); *Commonwealth* v. *Apalakis*, 396 Mass. 292, 298 (1985); *Commonwealth* v. *Gray*, 423 Mass. 293, 295-296 (1996). Cf. *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996); *Flaherty* v. *Contributory Retirement Appeal Bd.*, 48 Mass. App. Ct. 132, 135 (1999).

main brief on this appeal, the plaintiffs stated simply that the MBTA recording systems were "probably 'telephone equipment' under *O'Sullivan.*" They attempted to argue the contrary in their reply brief. We invited supplemental briefs.

Echoing the contention we have rejected under II *a, supra,* the plaintiffs appear to be saying that the recorders cannot be telephone equipment because they were supplied by non-telephone company sources. It is not so. Rather the meaning of telephone equipment is brought out in the *O'Sullivan* case itself.

Employees at the marketing center of the NYNEX telephone company made calls to NYNEX's subscribers offering new services. A computerized system recorded, randomly and secretly, for quality control purposes, the conversations between the telemarketers and the subscribers. A group of the subscribers sued NYNEX, claiming violation of the Massachusetts wiretap statute. The company defended successfully under the exception. The recording system, a combined software/hardware device known as "AutoQuality!," did not make or receive phone calls but recorded them for later playback. The parties in the *O'Sullivan* litigation were in agreement (see their briefs on the appeal) that it was a private company named Teknekron Info-switch, Inc. — not itself a telephone company — that manufactured and sold "AutoQuality!" to the defendant NYNEX. In holding that "AutoQuality!" was "telephone equipment" within the exception, the court relied on the fact that it was designed to operate with telephone lines for routine business use, was connected directly to the telephone lines, and served no function apart from use with phone lines. The court said: "If the device is connected directly to the phone line it is more likely to be 'telephone equipment' within the meaning of the wiretap statute." 426 Mass. at 265.

Similarly, the MBTA devices, commercially designed, were purchased by the defendant for routine business, were directly integrated into phone lines on which they depended in order to function, and recorded conversations for possible future listening. Contrast *Williams* v. *Poulos,* 11 F.3d 271, 280 (1st Cir. 1993) (cited in *O'Sullivan,* 426 Mass. at 264), where a makeshift system, pieced together from "alligator clips attached to a microphone cable at one end" and an "interface connecting [a] microphone cable to a [video cassette recorder] and a video camera" on the other, was not "telephone equipment." In contrast also is *Deal* v. *Spears,* 980 F.2d 1153, 1157 (8th Cir.

1992) (cited in *O'Sullivan*, 426 Mass. at 265), where the device was not integrated but was attached externally to an extension phone.[12] Perceiving no material distinction in design, function, or intended use between "AutoQuality!" and the MBTA machines, we follow the result in *O'Sullivan* and hold the latter recorders are telephone equipment. That *O'Sullivan* was decided under clause (b) of the exception rather than clause (a) — as NYNEX was itself a telephone company — does not affect the outcome; both clauses are modified by "telephone equipment" and it should have the same meaning in both contexts.[13] Our conclusion is in accord with persuasive out-of-State precedents that sketch the boundaries of the phrase "telephone equipment" and place the devices at issue here within its outline. Commercially produced, continuously recording multiple-channel tape devices, integrated into police telephone networks and strikingly similar to the MBTA recorders here, generally fall within the category.[14] A wide variety of other devices have also

---

[12]For similar reasons, *United States* v. *Murdock*, 63 F.3d 1391, 1392-1396 (6th Cir. 1995), cert. denied, 517 U.S. 1187 (1996), and *Pascale* v. *Carolina Freight Carriers Corp.*, 898 F. Supp. 276, 277-280 (D.N.J. 1995), both relied on by the plaintiffs, are distinguishable. The tape recorders in those cases, as in *Deal*, were not connected directly to the telephone line, but were attached externally to an extension telephone.

[13]The plaintiffs place emphasis on the court's statement in *O'Sullivan* that "[t]o come within the definition of 'telephone equipment,' the device must be used or supplied by the telephone company in the ordinary course of its business." 426 Mass. at 264. Consider the context. The defendant in *O'Sullivan* was itself a telephone company and was attempting to avail itself of clause (b) of the exception, which applies to "telephone . . . equipment . . . being used by a communications common carrier in the ordinary course of its business." G. L. c. 272, § 99 B 3. Despite the fact that the "AutoQuality!" system was not supplied by a telephone company, the court found it to be "telephone equipment" used by a telephone company in the ordinary course of its business.

[14]See *Jandak* v. *Brookfield*, 520 F. Supp. 815, 817-818, 822 (N.D. Ill. 1981); *In re State Police Litigation*, 888 F. Supp. 1235, 1242-1243, 1264 (D. Conn. 1995); *People* v. *Pitzman*, 293 Ill. App. 3d 282, 284, 289, 291 (1997).

The plaintiffs mention *Sanders* v. *Robert Bosch Corp.*, 38 F.3d 736, 740-741 (4th Cir. 1994) (2-1 decision) (cited in *O'Sullivan*, 426 Mass. at 265) (continuously recording, eight channel tape recording "voice logger" system not "telephone equipment"). Considering the similarity of the equipment in the two cases, the result in *Sanders* is inconsistent with that in *O'Sullivan*, and, as we suggest, unpersuasive.

been explicitly or implicitly considered "telephone equipment."[15]

c. "*Ordinary course of business.*" We reach the words of the exception that the equipment be "used by the subscriber or user in the ordinary course of its business." This requirement has been rightly recognized as the crux of the exception in its practical application. See *Campiti* v. *Walonis*, 611 F.2d 387, 392 (1st Cir. 1979); *Abel* v. *Bonfanti*, 625 F. Supp. 263, 269-270 (S.D.N.Y. 1985); Fishman & McKenna, Wiretapping & Eavesdropping, §§ 2.29-2.30, 2.33; Carr, The Law of Electronic Surveillance § 3.2(f)(1), at 3-59 (2d ed. 1986). "Ordinary course of . . . business" translates as "legitimate business purpose." *O'Sullivan* v. *NYNEX Corp.*, 426 Mass. at 266. There is no trouble accepting that MBTA had such a purpose in establishing a recording system; it acted upon the considerations of efficiency, safety, and sound maintenance record-keeping in a twenty-four hours a day mass transit operation that have been noted above. Similarly, the company in the *O'Sullivan* case had a sound business interest in monitoring the quality of telephone calls from telemarketers to customers. 426 Mass. at 267. For other examples of valid business justifications, see *Arias* v. *Mutual Cent. Alarm Serv., Inc.*, 202 F.3d 553, 559 (2d Cir. 2000); *Crosland* v. *Horgan*, 401 Mass. 271, 275-276 (1987).

In the nature of MBTA's recording system, it took in some calls made or received by employees that were personal to them, not business connected. This was an unavoidable byproduct or consequence of the necessarily continuous recording, and thus tolerable if the system in the main was lawful. See *Amati* v. *Woodstock*, 176 F.3d 952, 956 (7th Cir.), cert. denied, 120 S. Ct. 445 (1999). There is no suggestion in the record that MBTA has had any curiosity about the private affairs of its employees that it was seeking to satisfy by means of the recording system. Cf. *Watkins* v. *L.M. Berry & Co.*, 704 F.2d 577, 583 (11th Cir. 1983). If, in any particular case, MBTA exploited the system to serve an unseemly object, the individual employee could seek

[15]See *James* v. *Newspaper Agency Corp.*, 591 F.2d 579, 581-582 (10th Cir. 1979); *United States* v. *Paul*, 614 F.2d 115, 115-117 & n.1 (6th Cir.), cert. denied, 446 U.S. 941 (1980); *Briggs* v. *American Air Filter Co.*, 630 F.2d 414, 416-419 (5th Cir. 1980); *Epps* v. *St. Mary's Hosp. of Athens, Inc.*, 802 F.2d 412, 415-416 (11th Cir. 1986); *Berry* v. *Funk*, 146 F.3d 1003, 1005, 1009-1010 (D.C. Cir. 1998); *Abel* v. *Bonfanti*, 625 F. Supp. 263, 269-270 (S.D.N.Y. 1985).

relief quite separate from the omnibus claims asserted in this class action.

*Judgment affirmed.*