## The Cadle Company *vs.* Coreena M. Vargas.

No. 99-P-2069.

Bristol. January 16, 2002. - July 2, 2002.

Present: Laurence, Kaplan, & Dreben, JJ.

*Guaranty. Bank. Loan. Equal Credit Opportunity Act.*

A Superior Court judge correctly concluded that a wife who entered a guaranty of bank loans, promising to pay when due any debt then or thereafter incurred by her husband, was not liable on the guaranty to the purchaser of a bank loan on which the husband had defaulted, given the unforeseen, unusual circumstances that arose when the husband and wife were divorced and the husband had intended to use the very loan the wife guaranteed to fund his divorce settlement with his now former wife [364-368]; further, this court concluded that application of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f (1994), and the regulations thereunder to the circumstances also favored the guarantor wife [368-371].

Civil action commenced in the Superior Court Department on August 19, 1996.

The case was heard by *John A. Tierney*, J.

*Robert F. Tenney* for the plaintiff.

*Geoffrey A. Domenico* for the defendant.

Kaplan, J. Unforeseen, unusual circumstances, which arose after a guaranty of bank loans was entered into, made enforcement of the literal terms of the guaranty offensive to common sense and incompatible with good faith and fair dealing. We agree with the trial judge's decision to that effect and affirm the judgment against the plaintiff purchaser of a defaulted bank loan and in favor of the defendant guarantor. Application of the Equal Credit Opportunity Act (ECOA), 15 U.S.C. §§ 1691-1691f (1994), and regulations thereunder to the subject matter also favors the guarantor.

1. *The case.* Accepting the judge's findings as well supported, we restate them in rather more sequential form and with some elaboration from facts of record.

The defendant, now called Coreena Vargas, was earlier married to Paul A. Newfield from 1963 to 1989. The couple separated in 1988 and were divorced in 1989.

Newfield was active in a number of real estate and other business ventures during the marriage, and in the course of business obtained a series of loans from BayBank, N.A., Taunton branch (BayBank). From 1984 onward Newfield's account in the bank was in the charge of Peter B. Selley, latterly an officer of the bank.

The defendant was of quite limited business experience.[1] Routinely she signed loan and perhaps other documents that her husband brought home for her signature. She did not read these papers. She never attended a loan closing. On December 13, 1985, in connection with one of the husband's loan transactions, the defendant signed a preprinted form of guaranty prepared by the bank.[2] By its terms this instrument was a continuing guaranty, without limit of time or amount, of any debt Newfield incurred, then or thereafter, in favor of BayBank. The guaranty was to continue until terminated, with future effect, by the guarantor's written notice to the bank, or by the bank's surrender of the guaranty to the guarantor.

Some three and one-half years later, on June 14, 1989, Newfield borrowed the principal amount of $215,000 from BayBank on short loan of ninety days in order to close a divorce settlement with the defendant: he used the proceeds of the loan (and an additional $85,000) to purchase from the defendant her one-half interest in properties that had been held by the couple jointly. For collateral on the loan, Selley looked to Thomas Zoll, friend and former business associate of Newfield and a

---

[1]She was a homemaker, raising a child whom the couple had adopted in 1976 and caring for her own ailing mother in the early 1980's. The defendant held a real estate salesperson's license but rarely used it.

[2]The defendant acknowledged that she had from time to time signed papers that Newfield brought home, but she had no specific recollection about the 1985 paper. She assumed the signature was hers (the line for signature by "witness" was left blank). The plaintiff improved on the point (needlessly) by the testimony of a handwriting expert.

The defendant had signed an unlimited guaranty back in 1980 where the named borrower at the time was Newfield "d/b/a PA-CO Communications," one of Newfield's businesses. The plaintiff does not base a separate claim against Newfield or the defendant on this 1980 guaranty.

customer of the bank; Zoll signed as guarantor of the loan and pledged $100,000 of United States Treasury securities.

The defendant was unaware of the loan; she believed Newfield was raising the money for the settlement by selling some property.

Selley testified he was unaware of the 1985 guaranty when the $215,000 loan closed. He was aware, as the court found, that the purpose of the loan was to finance Newfield's payment to the defendant for her equitable share of marital assets, including income properties, so Newfield could then hold title in his own name.[3]

After June 14, 1989, Newfield reduced the loan, leaving a balance of $90,000. At this stage Selley released the pledged United States Treasury notes to Zoll but carelessly left Zoll's guaranty in Zoll's file. When the bank's internal credit committee approved a rollover of the $90,000 balance on February 20, 1990, it was on the basis of Selley's written report of January 31, 1990, reciting the purpose of the $215,000 loan, confirming the reduction of the loan upon the sale of one of Newfield's income properties, and noting that the remaining $90,000 "will be repaid from the sale of [a Taunton condominium unit] . . . under P & S." Selley's report made no mention of any open guaranty.

There were subsequent rollovers, the last embodied in a note dated August 27, 1990. Newfield encountered difficulties and the note fell into default. By arrangement, mortgage payments, owed to Newfield upon his sale of the condominium, were

[3]In respect to this finding of Selley's awareness: The defendant testified she understood Newfield had informed the bank the couple "were divorcing." Selley testified about the source of his own statement in his January 31, 1990, report in the bank file (described *infra*) that the "$215M note was originally used to buy out [Newfield's] ex-wife's interest in several pieces of real estate." The source was Newfield; Selley said Newfield "must have" told him he was getting divorced or was already divorced. So also the amount of this loan was measurably larger than his bank loans over the past eight years and a banker would want assurance about the reason for this loan. In fact, Selley secured the Zoll guaranty and pledge. Thus there is good support that Selley (and thus the bank) was well informed when the large loan was made. In any case, it is common ground that Selley was informed by January 31, 1990, and it is the $90,000 rollover note of August 27, 1990, see *infra*, which is the basis of the instant lawsuit.

agreed to be paid to BayBank to reduce the note. The note, however, was still in default on June 15, 1994, when BayBank sold it to Fleet Amherst Financial Group, Inc., which on July 28 1994, sold it to the Cadle Company, the plaintiff herein.

When the August 27, 1990, note and related papers were turned over to the plaintiff company, an account person there, Lorna Vugrinovich, found seemingly open guaranties by Zoll and the defendant in the files, and so, on January 23, 1995, she sent letters to each, making claim. They severally protested.

Zoll got in touch with Selley at the bank who, in turn, spoke with Vugrinovich. Selley said the Zoll guaranty should have been released to Zoll back in 1990 when the Treasury securities were released; his (Selley's) failure to see to this at the time was, he said, "poor housework" on his part. In February, 1995, Selley wrote to Vugrinovich, advising the Cadle Company to discharge the Zoll guaranty, which they did.

The defendant, for her part, telephoned Vugrinovich complaining of the demand; then she spoke with the Attorney General's office. She did not follow up and call the bank. Selley did not recall the defendant's guaranty being mentioned in his conversation with Vugrinovich; she said she did mention it, and Selley replied he did not know about it but would look into it. It happened that Selley left BayBank for a position at Bristol County Savings Bank in late April, 1995, without further action. The judge found that, had the defendant followed up with the bank, Selley would have advised Vugrinovich to release the defendant's guaranty, as was done with Zoll.

The plaintiff company commenced the present action in Superior Court on August 19, 1996, against Newfield and defendant Vargas based, respectively, on the note of August 27, 1990, and the guaranty of 1985. Newfield did not defend, and the plaintiff secured a default judgment against him for $49,958.88 with accrued interest from June 13, 1996, at the per diem rate of $13.88 and costs of $14,976.68. The case against Vargas was tried jury-waived to a conclusion and ended in her favor.

2. *Fair dealing.* The guaranty instrument in suit was a not unfamiliar bank form: by its terms the guarantor promises to pay when due any debt then or thereafter incurred by the named debtor to the bank, and much of the rest of the form negates,

point by point, possible conditions upon or defenses to the obligation. By the generality of the guaranty form, the defendant's promise could be read to extend nominally to Newfield's promissory note of June 14, 1989, as reduced to the note of August 27, 1990, on which suit was brought. Nominally the guaranty might so extend,[4] but in substance the guaranty form was a misfit and an incongruity when the bank (or successor[5]) sought to apply it to the situation arising from a divorce between the once debtor-husband and the once wife-guarantor. The divorce changed vitally the roles of the actors; compare the many cases where, in the course of a continuing guaranty, the situation or status or conduct of the debtor changes materially with effect on the exposure of the guarantor, who may thereby claim to be relieved.[6] The incongruity in the present case appears sharply when one considers what would be the consequence of the enforcement of the guaranty against this defendant. The loan was intended for use to fund Newfield's divorce settlement with his wife, but she now turns up (on the plaintiff's view) as the guarantor of the very loan. If she were cast in judgment on the guaranty, she would in effect, by the amount of the judgment against her, reduce the settlement to which she was entitled and which it was the object of the loan to achieve. Such a result — the divorced wife underwriting the husband's duty to carry out the settlement — would be a perverse anomaly.

In any long-term contractual relationship (here a continuing unlimited guaranty) a situation may arise that was unforeseen when the instrument was written. The question arises whether in reason or fairness the old text should be held still to govern.

---

[4]Instead of saying the guaranty form extended in terms, but should not extend in reason, it might be more suitable to say the form in the circumstances was an irrelevance — like using the wrong form, one designed for a different transaction.

[5]Having purchased the note after an uncured default, the plaintiff company is not entitled to holder in due course status, G. L. c. 106, § 3-302(2), and takes the note subject to all defenses available against the bank. G. L. c. 106, § 3-306.

[6]See decisions collected in Annot., Change in Name, Location, Composition, or Structure of Obligor Commercial Enterprise Subsequent to Execution of Guaranty or Surety as Affecting Liability of Guarantor or Surety to the Obligee, 69 A.L.R.3d 567 (1976 & Supp. 2001).

The old text should not be applied if common sense tells us that the result would be absurd or unreasonable: "Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." *Fishman* v. *LaSalle Natl. Bank*, 247 F.3d 300, 302 (1st Cir. 2001), citing *Fleet Natl. Bank* v. *H & D Entertainment, Inc.*, 96 F.3d 532, 538 (1st Cir. 1996), cert. denied, 520 U.S. 1155 (1997). See *Stop & Shop, Inc.* v. *Ganem*, 347 Mass. 697, 701 (1964); *Whelan* v. *Frisbee*, 29 Mass. App. Ct. 76, 81 (1990); 2 Farnsworth, Contracts § 7.10, at 274-277 (2d ed. 1998).[7]

In such cases of discordance between text and reality, courts strive for a just solution by bringing to bear the familiar standard that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205 (1979). See *Larson* v. *Larson*, 37 Mass. App. Ct. 106, 109 (1994); Farnsworth, *supra* § 7.17b, at 376-378. The duty translates into an "implied" term or condition of the contractual arrangement. See *Druker* v. *Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976); *Starr* v. *Fordham*, 420 Mass. 178, 184 (1995); *MacGillivary* v. *Dana Bartlett Ins. Agency of Lexington, Inc.*, 14 Mass. App. Ct. 52, 57 (1982). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205 comment a. The trial judge in his rulings of law recurred to the § 205 standard and wrote in harmony with comment a. He concluded there was basis on the exceptional facts (clustering about the unforeseen divorce settlement) to save the defendant from liability under the guaranty.[8]

---

[7]"If literalness is sheer absurdity, we are to seek some other meaning whereby reason will be instilled and absurdity avoided." *Outlet Embroidery Co.* v. *Derwent Mills, Ltd.*, 254 N.Y. 179, 183 (1930) (Cardozo, C.J.).

[8]This problem of the text of a contract becoming inapposite by change of conditions finds a parallel in statutory text. See *North Shore Realty Trust* v. *Commonwealth*, 434 Mass. 109, 110-112 (2001); *Dillon* v. *Massachusetts Bay Transp. Authy.*, 49 Mass. App. Ct. 309, 315-316 (2000); 2A Singer, Sutherland Statutory Construction § 45.05, at 32-34 (6th ed. 2000).

The judge reinforced this decision by reference to "equities" that he perceived in the case,[9] as follows:

"[T]he equities favor judgment for Vargas because: (a) she signed the [g]uaranties[10] at issue not as a corporate principal seeking to benefit directly from a corporate loan, but as a wife accommodating her husband's request, which is not an unusual practice for married individuals, (b) the commercial loan on which the plaintiff seeks to recover was executed without Vargas' knowledge and over a year *after* her divorce, (c) at the time of the 1990 [n]ote, Bay-Bank knew that Vargas was divorced from the note maker, (d) BayBank did not rely on the Vargas [g]uaranties in granting either the 1989 or the 1990 loans,[11] (e) Vargas received no benefit from the 1990 loan, (f) at all times prior to the sale of the obligation to the plaintiff, BayBank treated the 1990 [n]ote as unsecured and as being solely Newfield's obligation, and (g) the only other guarantor (Thomas Zoll), who was a partner and friend of Newfield,

[9]A similar usage of "equities" appears in *Hamlen* v. *Rednalloh Co.*, 291 Mass. 119, 126 (1935): "A creditor owes one who is a surety for a debt or undertaking the duty of continuous good faith in dealing with the debt or undertaking, or with security received to assure the payment of the debt or the performance of the undertaking. The duty arises not from any contract of the creditor with the surety but from the equities of the situation."

[10]For the reason for the judge's use of the plural form, see note 2, *supra*, and the references in (d) of the judge's quoted statement.

[11]Here the judge was summarizing evidence, including documentary evidence, that the bank lent money on the footing that the loan was unsecured (except for the Zoll guaranty and pledge). See also (f) in the judge's quoted statement. In the present context of considerations of fairness, it seems not improper for the judge to speak of the absence of reliance by the bank, although the guaranty form excludes this as a possible defense by the guarantor. Similarly, the judge wrote to the effect that Vargas was not barred from relief although by the guaranty provisions she waived notification from the bank and failed herself to notify the bank she was terminating the guaranties. We suggest that to allow the bank to rely on the defendant's failure to give notice, when the bank had plenty of information, would be to reward "opportunistic behavior" that would "violate the duty of good faith performance however the duty is formulated." *Market St. Assocs. Ltd. Partnership* v. *Frey*, 941 F.2d 588, 595, 596 (7th Cir. 1991). The judge thought the bank would be "estopped" from recovering against Vargas by reason of its not returning or destroying Vargas's guaranties on learning of the divorce. If a technical estoppel could not be made out, the judge's point remains that the circumstance of the divorce was critical in judging the case on the merits.

was released long after the note was in default leaving Vargas solely liable."

We agree with the judge's decision as enhanced by the foregoing considerations.

Our decision is limited in its scope, as it is by its justification, to the unusual situation appearing of record. For bank loans with standard guaranties, unaffected by such special conditions, the text of the contracts will of course control, interpreted on conventional lines. So the recent case of *Federal Financial Co.* v. *Savage*, 431 Mass. 814, 817-821 (2000), is an instance where failed negotiations to stiffen the terms of a continuing guaranty in connection with a renewed and enlarged loan were held not to discharge the existing guaranty, and the guarantor, failing to terminate it, was liable on the new loan.[12] See *Shawmut Bank, N.A.* v. *Wayman*, 34 Mass. App. Ct. 20, 23-24 (1993). Compare *Amsco, Inc.* v. *Foze*, 8 Mass. App. Ct. 796 (1979).

3. *Federal regulation.* We have dealt so far with the common law, so to speak. The judge noted the law in some respects had lately been modified by Federal statute and regulation, and he questioned whether the reform might apply to the instant case. The question had not been briefed below. It was raised again at the argument of the appeal, and we invited comments from the parties.

The Equal Credit Opportunity Act (ECOA), 15 U.S.C. §§ 1691-1691f, provides in § 1691(*a*):

> "It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction — (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract). . ."

Before December 16, 1985, § 202.2(e) of Regulation B, issued by the Federal Reserve Board, had defined "applicant" so as to

---

[12]Actually the defendant in the *Savage* case was held only to the extent of the old loan because the plaintiff had not cross-appealed. *Id.* at 816, 821. The guarantor was president of, and interested in, the debtor corporation, and the transaction was at arm's length between sophisticated individuals. *Id.* at 815, 820.

exclude "guarantor" and similar parties. See 12 C.F.R. § 202.2(e) (1985). As of that date,[13] § 202.2(e) was amended to read:

> "*Applicant* means any person who requests or who has received an extension of credit from a creditor, and includes any person who is or may become contractually liable regarding an extension of credit. For purposes of § 202.7(d), the term includes guarantors, sureties, endorsers and similar parties."

12 C.F.R. § 202.2(e) (2002). And § 202.7(d) provides:

> "*Signature of spouse or other person* — (1) *Rule for qualified applicant.* Except as provided in this paragraph, a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested."

12 C.F.R. § 202.7(d) (2002). See generally *BayBank* v. *Bornhofft*, 427 Mass. 571, 574-576 (1998).

The plaintiff contends that as the defendant signed the guaranty instrument on December 13, 1985, she was shy by three days of the protection of the ECOA, and, further, her unprotected condition persisted when the $215,000 loan was executed on June 14, 1989. The latter proposition seems to us questionable: the changed policy regarding guarantors was, on June 14, 1989, more than three years old; the bank currently evaluated and made the loan and, we should think, would be bound by the reigning policy of Regulation B, §§ 202.2(e) and 202.7(d)(1). We should not overlook the fact that the loan was secured by the Zoll guaranty and pledge, with the defendant's guaranty at most a formal tagalong. (Presumably it would be of no consequence whether the defendant on June 14, 1989, was a married or divorced spouse — note the words "sex or marital

---

[13]That the crucial date is December 16, 1985, seems settled by *Silverman* v. *Eastrich Multiple Investor Fund, L.P.*, 51 F.3d 28, 30-31 (3d Cir. 1995). Other cases had mentioned October 1, 1986, and the literature sometimes referred to January 1, 1986. For our present analytical purposes it would make no difference which of these dates applies.

status" in the statute, and "applicant's spouse or other person" in § 202.7[d][1].) The issue of the application of the reformed policy arises also in connection with the rolled over $90,000 note of August 27, 1990. Here we need to observe that the applicant Newfield was evidently considered creditworthy on that date, since the Zoll pledge was released (and Zoll's guaranty should have fallen away, as Selley indicated).[14]

The case of *Stern* v. *Espirito Santo Bank of Fla.*, 791 F. Supp. 865 (S.D. Fla. 1992), supports the view that the reformed policy regarding guaranties applies to a loan transaction after December 16, 1985, even where the continuing guaranty was executed before that date — and even where the loan was a renewal rather than an original loan. The court said: "[T]he ECOA imposes an affirmative obligation upon a creditor to reevaluate the need for an additional party when a credit obligation is renewed, and to do so without discrimination on the basis of marital status or any of the other bases enumerated in the Act." *Id.* at 869. The *Stern* case bears especially on our situation of the $90,000 rolled over note.[15]

*BayBank* v. *Bornhofft*, 427 Mass. at 572-573, 578-579, is distinct from the present case, as the defendant mother there was herself financially interested in the loan and had the status of a "joint applicant" under the exception written into § 202.7(d)(1) of Regulation B, in which, according to the Federal Reserve Board's commentary on the regulation, joint applicant "refers to someone who applies contemporaneously with the applicant [the son] for shared or joint credit. . . ." 12 C.F.R. pt. 202, supp. I, par. 7(d)(1) (2002). See *Baybank* v. *Bornhofft*, 427 Mass. at 578-579.

---

[14]The Federal Reserve Board's official commentary on § 202.7(d) states: "If the borrower's creditworthiness is reevaluated when a credit obligation is renewed, the creditor must determine whether an additional party is still warranted and, if not, release the additional party." 12 C.F.R. pt. 202, supp. I, par. 7(d)(5) (2002).

[15]The ECOA has a two-year limitations period for actions to secure damages for violations of the Act, 15 U.S.C. § 1691e(f), but there is no such limit of time for defenses based on violations. See *Silverman* v. *Eastrich Multiple Investor Fund*, 51 F.3d at 31-32.

Thus the defendant can claim shelter under the statute and regulation.[16]

*Judgment affirmed.*

---

[16]The Federal legislation with administrative statements is not without influence on the "good faith and fair dealing" mentioned above in our opinion. "The [legislative] policy thus established has become itself a part of our law, to be given its appropriate weight not only in matters of statutory construction but also in those of decisional law." *Gaudette* v. *Webb,* 362 Mass. 60, 70 (1972), quoting from *Moragne* v. *States Marine Lines Inc.,* 398 U.S. 375, 409 (1970). See Landis, Statutes and the Sources of Law, in Harvard Legal Essays 213, 219, 233 (1934); Stone, Common Law in the United States, 50 Harv. L. Rev. 4, 13-14 (1936).