## Commonwealth *vs.* Michael J. Hyde.

Plymouth. April 2, 2001. - July 13, 2001.

Present (Sitting in Northampton): Marshall, C.J., Greaney, Spina, Cowin, Sosman, & Cordy, JJ.

*Eavesdropping. Electronic Surveillance. Constitutional Law,* Privacy. *Words,* "Interception," "Oral communication."

A motorist who, having been stopped by police officers, secretly tape recorded statements made by the officers during the stop was properly convicted on a complaint charging him with unlawfully intercepting the oral communications of another, in violation of G. L. c. 272, § 99 F, where the Legislature intended § 99 strictly to prohibit all secret recordings by members of the public, including recordings of police officers or other public officials interacting with members of the public, when made without their permission or knowledge. [597-602] Marshall, C.J., dissenting, with whom Cordy, J., joined.

Complaint received and sworn to in the Brockton Division of the District Court Department on January 28, 1999.

A motion to dismiss was heard by *James F.X. Dinneen,* J., and the case was tried before *David G. Nagle, Jr.,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Peter M. Onek,* Committee for Public Counsel Services, for the defendant.

*Robert C. Thompson,* Assistant District Attorney, for the Commonwealth.

*William C. Newman & John Reinstein,* for American Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

Greaney, J. This case raises the issue whether a motorist may be prosecuted for violating the Massachusetts electronic surveillance statute, G. L. c. 272, § 99, for secretly tape recording statements made by police officers during a routine traffic stop. A jury in the District Court convicted the defendant on four

counts of a complaint charging him with unlawfully intercepting the oral communications of another, in violation of G. L. c. 272, § 99 F. The defendant appealed, and we granted his application for direct appellate review. We conclude that G. L. c. 272, § 99, strictly prohibits the secret electronic recording by a private individual of any oral communication, and makes no exception for a motorist who, having been stopped by police officers, surreptitiously tape records the encounter. Accordingly, we affirm the judgments of conviction.

The relevant facts are not in dispute. On October 26, 1998, just after 10:30 P.M., an Abington police officer stopped the defendant's white Porsche, because the automobile had an excessively loud exhaust system and an unlit rear registration plate light. Three other Abington police officers arrived shortly thereafter and the stop quickly became confrontational.[1] During the course of the stop, which lasted approximately fifteen to twenty minutes, the defendant and his passenger, Daniel Hartesty, were ordered out of the automobile, and Hartesty was pat frisked. One officer reached into the automobile, picked up a plastic shopping bag that lay on the floor by the passenger seat, and looked inside. (The bag contained compact discs.) At one point, the defendant stated that the stop was "a bunch of bullshit," and that he had been stopped because of his long hair. One officer responded, "Don't lay that shit on me." Later, another officer called the defendant "an asshole." The defendant was asked whether he had any "blow" (cocaine) in the car. At the conclusion of the stop, the defendant and Hartesty were allowed to leave. No traffic citation was issued to the defendant, and the defendant was not charged with any crime. According to the testimony of one police officer, the defendant was "almost out of control" and the stop "had gone so sour," that it was

---

[1]According to the testimony of the officers who made the stop, the defendant was loud, argumentative, and uncooperative. Although the police officers and Daniel Hartesty, a passenger in the defendant's car, attempted to calm the defendant, he became more and more unruly as the stop progressed. Hartesty, on the other hand, testifying for the defendant, stated that the defendant was not combative, but that the defendant and the officers "were bickering." Hartesty also testified that he was illegally searched and that one officer threatened to give the defendant a road sobriety test, which the officer "promised" the defendant would fail.

deemed in everyone's interest simply to give the defendant a verbal warning. Unbeknownst to the officers, however, the defendant had activated a hand-held tape recorder at the inception of the stop and had recorded the entire encounter.

Six days later, the defendant went to the Abington police station to file a formal complaint based on his unfair treatment during the stop. To substantiate his allegations, he produced the tape recording he had made. A subsequent internal investigation conducted by the Abington police department, which concluded on February 1, 1999, exonerated the officers of any misconduct.

In the meantime, the Abington police sought a criminal complaint in the Brockton Division of the District Court Department against the defendant for four counts of wiretapping in violation of G. L. c. 272, § 99. A clerk-magistrate refused to issue the complaint, and the Commonwealth appealed. After a show cause hearing, a judge in the District Court ordered that the complaint issue.

The defendant filed a motion to dismiss the complaint. He claimed that G. L. c. 272, § 99, was intended to protect the privacy rights of individuals, and, because the police officers were performing official police duties during the stop of his car, they had no privacy expectations in their words, and, as a result, their conversation should not be considered "oral communication" within the statute. Because, in the defendant's view, there was no interception of any "oral communication," there could be no violation of G. L. c. 272, § 99. In support of his position, the defendant relied on Federal cases interpreting the term "oral communications" as defined in the Federal electronic surveillance statute, 18 U.S.C. § 2510 (2000), to require the speaker to have a justifiable expectation of privacy. The defendant asserted that Massachusetts courts have looked to Federal decisions interpreting the Federal statute for guidance in interpreting other portions of our electronic surveillance statute, see *Commonwealth* v. *Look*, 379 Mass. 893 (1980), and so we should also look to Federal precedent for the proper interpretation of the term "oral communication" in our statute.

The judge (the same judge who had ordered that the complaint issue) rejected the defendant's argument and denied the motion to dismiss. The judge reasoned that the definition of

"oral communication" under G. L. c. 272, § 99 B 2 ("speech, except such speech as is transmitted over public air waves by radio or other similar device"), was clear, and, unlike the definition in the Federal electronic surveillance statute,[2] did not require an expectation of privacy by the speaker in order to make the statute applicable. He concluded that the Massachusetts statute prohibited the secret tape recording of the police officers' speech. The defendant was tried before a jury and convicted of four counts of violating G. L. c. 272, § 99.

The defendant once again claims, as his principal argument, that the judge improperly denied his motion to dismiss, because the police officers did not possess any privacy interest in the words they spoke in the course of the stop, and, therefore, his tape recording of the encounter did not violate G. L. c. 272, § 99. The Commonwealth asserts that the plain language of the statute unambiguously expresses the Legislature's intent to prohibit the secret recording of the speech of anyone, except in specifically delineated circumstances. We agree with the Commonwealth.

General Laws c. 272, § 99 C 1, set forth below,[3] prohibits, unless otherwise specified in the statute, the intentional interception of any oral communication. The statute provides that "[t]he term 'interception' means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any

---

[2]The definition of "oral communication" in the Federal electronic surveillance statute is "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication." 18 U.S.C. § 2510(2) (2000).

[3]The relevant text of G. L. c. 272, § 99 C 1, reads as follows:

> "Except as otherwise specifically provided in this section any person who — willfully commits an interception, attempts to commit an interception, or procures any other person to commit an interception or to attempt to commit an interception of any wire or oral communication shall be fined not more than ten thousand dollars, or imprisoned in the state prison for not more than five years, or imprisoned in a jail or house of correction for not more than two and one half years, or both so fined and given one such imprisonment."

intercepting device[4] by any person other than a person given prior authority by all parties to such communication . . . ." G. L. c. 272, § 99 B 4. An "oral communication" is defined as "speech, except such speech as is transmitted over the public air waves by radio or other similar device." G. L. c. 272, § 99 B 2. Exceptions to the general prohibition are clearly specified within the statute and include recordings by (1) a communication common carrier in the ordinary course of its business, see G. L. c. 272, § 99 D 1 a (commonly referred to as "service observing"); (2) persons using an office intercommunication system in the ordinary course of their business, see G. L. c. 272, § 99 D 1 b; (3) an investigative or law enforcement officer, if the officer is a party to such communication or has been given prior authority by such a party, and if the recording is made in the course of investigating certain designated offenses in connection with organized crime, see G. L. c. 272, § 99 B 4 and 7; and (4) persons duly authorized to make specific interceptions by a warrant issued pursuant to the statute, see G. L. c. 272, § 99 D 1 d. The statute is carefully worded and unambiguous, and lists no exception for a private individual who secretly records the oral communications of public officials.

We have no doubt that the plain language of the statute accurately states the Legislature's intent. The Report of the Special Commission on Electronic Eavesdropping, 1968 Senate Doc. No. 1132, at 6, confirms that the statute's strict prohibition of all secret recording by members of the public grew out of concern over the commercial availability of electronic devices capable of intercepting wire or oral communications, and the recognition that there was no way effectively to prohibit the sale or manufacture of these devices. These concerns led the commission to revise the prior version of the statute, which had allowed secret recording on private premises, see G. L. (Ter. Ed.) c. 272, § 101 ("nothing contained [herein] shall render it unlawful for any person to install and use such a device on premises under his exclusive control"), repealed by St. 1968, c. 738, § 5, to "strictly prohibit [the public from] electronic

---

[4]The term "intercepting device" is defined as "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication." G. L. c. 272, § 99 B 3.

eavesdropping and wiretapping of other persons' conversations without permission." 1968 Senate Doc. No. 1132, at 9.

In addition, until the 1968 amendments, the law had permitted the recording of one's own conversations, or conversations with the prior permission of one party (traditionally known as "one-party consent"). See G. L. c. 272, § 99, as appearing in St. 1959, c. 449, § 1 ("Whoever . . . secretly or without the consent of either a sender or receiver . . ."). The commission revised the statute generally to disallow recordings made with one-party consent, thus rejecting the prevalent approach taken by other States, and by the comparable Federal electronic surveillance statute, that generally permitted wiretapping and eavesdropping in cases of one-party consent. See *Commonwealth* v. *Thorpe*, 384 Mass. 271, 280 n.7 (1981), cert. denied, 454 U.S. 1147 (1982) (examining Legislature's decision in 1968 amendments to allow some warrantless surveillance by law enforcement officers, but limiting the reach of one-party consent to interception of offenses in connection with organized crime). The commission clearly designed the 1968 amendments to create a more restrictive electronic surveillance statute than comparable statutes in other States.[5] See *Commonwealth* v. *Jackson*, 370 Mass. 502, 506 & n.6 (1976). We conclude that the Legislature intended G. L. c. 272, § 99, strictly to prohibit all secret recordings by members of the public, including recordings of police officers or other public officials interacting

[5]Every State, with the exception of Vermont, has some type of eavesdropping or wiretapping statute. The majority contain language that, to some degree, prohibits only the surreptitious recording of another's words when spoken with a reasonable expectation of privacy. See, e.g., Ala. Code § 42.20. 300 (Michie 1996) (Alabama: "private communication"); Ga. Code Ann. § 16-11-60 (Michie 1996) (Georgia: "in private place"); Mich. Comp. Laws § 750.539a (1996) (Michigan: "private discourse of others"); N.H. Rev. Stat. Ann. § 570-A: 1 (1995) (New Hampshire: "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation"). In addition, as recognized by the judge in his memorandum denying the defendant's motion to dismiss, the Federal electronic surveillance statute, see note 2, *supra*, similarly limits "oral communication" to the speech of a person who holds a justifiable expectation that it will not be subject to interception. For an extensive discussion of various State electronic surveillance statutes, see C. Bast, What's Bugging You? Inconsistencies and Irrationalities of the Law of Eavesdropping, 47 DePaul L. Rev. 837, 868-881 (1998).

with members of the public, when made without their permission or knowledge.

We reject the defendant's argument that the statute is not applicable because the police officers were performing their public duties, and, therefore, had no reasonable expectation of privacy in their words. The statute's preamble expresses the Legislature's general concern that "the uncontrolled development and unrestricted use of modern electronic surveillance devices pose[d] grave dangers to the privacy of all citizens of the commonwealth" and this concern was relied on to justify the ban on the public's clandestine use of such devices. G. L. c. 272, § 99 A. See *Commonwealth* v. *Gordon*, 422 Mass. 816, 833 (1996). While we recognize that G. L. c. 272, § 99, was designed to prohibit the use of electronic surveillance devices by private individuals because of the serious threat they pose to the "privacy of all citizens," the plain language of the statute, which is the best indication of the Legislature's ultimate intent, contains nothing that would protect, on the basis of privacy rights, the recording that occurred here.[6] In *Commonwealth* v. *Jackson*, *supra* at 506, this court rejected the argument that,

---

[6]The defendant cites *State* v. *Flora*, 68 Wash. App. 802, 806 (1992), in which the Court of Appeals of Washington held, on nearly identical facts, that an arrestee's attempt to use a tape recorder to record his arrest did not violate Washington's electronic surveillance statute, because the police officers had no reasonable expectation of privacy in their words. This case is inapposite, however, because the Washington electronic surveillance statute prohibits only the secret recording of *private conversations*, see Wash. Rev. Code Ann. § 9.73.030(1)(b) (2000). Accord *Commonwealth* v. *Henlen*, 522 Pa. 514, 517 (1989) (secret recording of interrogation by prison guard suspected of theft did not violate Pennsylvania's electronic surveillance statute, because interrogating officer had no justifiable expectation of privacy). See 18 Pa. Cons. Stat. § 5702 (2000) (defining "oral communications" as "any oral communication uttered by a person possessing an expectation that such communication is not subject to interception under circumstances justifying such expectation").

Because our own statute broadly prohibits the interception of *speech* (except that which is transmitted over public air waves), see G. L. c. 272, § 99 B 2, whether the police officers possessed privacy interests in their words spoken in the course of performing their public duties, or whether the encounter constituted a routine traffic stop or a custodial interrogation, as argued by the defendant, are issues that we need not address. Consideration of such issues would only be warranted in a civil suit for damages under G. L. c. 272, § 99 Q, which allows actual and punitive damages, as well as attorneys fees, for:

because a kidnapper has no legitimate privacy interest in telephone calls made for ransom purposes, the secret electronic recording of that conversation by the victim's brother would not be prohibited under G. L. c. 272, § 99: "[W]e would render meaningless the Legislature's careful choice of words if we were to interpret 'secretly' as encompassing only those situations where an individual has a reasonable expectation of privacy." *Id.*[7]

The defendant concedes the restrictive nature of the statute's language, but urges us, nevertheless, to recognize an exception to the statute's prohibition. In support of his request, the defendant cites *Commonwealth* v. *Gordon, supra* at 832-833, where this court held that G. L. c. 272, § 99 P, which allows a criminal defendant to move to suppress evidence obtained in violation of G. L. c. 272, § 99, does not prohibit a judge from allowing in evidence routine administrative recordings of a defendant's booking procedure following an arrest. That decision, however, dealt primarily with the admissibility of a secret recording as evidence, and not with whether a violation of the statute had occurred. Moreover, the defendant cannot claim that his recording was made as a routine, administrative procedure, when the record indicates that he recorded the officers' words fully intending to use the recording as proof in his subsequent complaint of police misconduct.[8]

The defendant argues that his prosecution was tantamount to

---

"any aggrieved person whose oral or wire communications were intercepted, disclosed, or used except as permitted or authorized by this section *or whose personal or property interests or privacy were violated* by means of an interception except as permitted or authorized by this section shall have a civil cause of action against any person who so intercepts, discloses or uses such communications *or who so violates his personal, property or privacy interest* . . ." (emphasis added).

[7]We reject the defendant's argument that police officers acting in their official capacity are not "persons" entitled to the protection of G. L. c. 272, § 99. See *Commonwealth* v. *Voight*, 28 Mass. App. Ct. 769, 771-773 (1990) (town, as political subdivision of Commonwealth, cannot be victim of telephone harassment, but dispatcher, as individual public employee, could be appropriate victim).

[8]The defendant also points to *Dillon* v. *Massachusetts Bay Transp. Auth.*, 49 Mass. App. Ct. 309 (2000), where the Appeals Court departed from the

holding him criminally liable for exercising his constitutional rights to "petition [the government] for redress of his grievances and to hold police officers accountable for their behavior." This argument has no merit. The defendant freely exercised his right to petition by filing his complaint of police misconduct with the Abington police department. An internal investigation was conducted pursuant to his complaint, which included, according to the trial testimony of the officer in charge of the investigation, a review of the defendant's tape of the encounter. The defendant was not prosecuted for making the recording; he was prosecuted for doing so secretly.

The dissent reaches its conclusion by ignoring the unambiguous language and definitions of the statute and by relying on purported (and dubious) legislative history. The dissent suggests that the defendant's secret recording of the words of the police officers should be lawful, because such recording may tend to hold police officers accountable for improper behavior. Implicit in the dissent's position is the even broader suggestion that police officers routinely act illegally or abusively, to the degree that public policy strongly requires documentation of details of contacts between the police and members of the public to protect important rights. We doubt the validity of the dissent's major premise, and we are not convinced that the widespread clandestine recording of encounters between individuals and police officers would be desirable or even efficacious.[9] Nor do we think, as the dissent does, that police officers should be

statute's strict language banning electronic recording except that done by telephone equipment supplied by a communications common carrier (i.e., a telephone company). See G. L. c. 272, § 99 B 3. Recognizing sweeping changes in the telecommunications industry since the statute's enactment, and the fact that common telephone equipment is now widely available from entities other than telephone companies, the court properly allowed the exception to apply, even though the intercepting device had been obtained from a commercial equipment manufacturer. *Id.* at 315-316 ("We do not depart lightly from the express wording of a statute . . . but in the unusual circumstances appearing here we agree with the court below that a deviation is justified"). The *Dillon* decision is easily distinguishable from this case. The court departed from the words of the statute to preserve the Legislature's intent; here, as discussed above, the relevant provisions of the statute mirror the Legislature's intent.

[9]Although we have stated that the electronic recording by the police of interrogations is a good practice, see *Commonwealth* v. *Diaz*, 422 Mass. 269,

singled out for particular approbation to safeguard the integrity of the "Republic." *Post* at 612-613. Followed to its logical conclusion, the dissent would encourage drug manufacturers to mount hidden video cameras in their facilities so they can capture the moment of truth when the police execute a search warrant and would authorize drug dealers secretly to tape record conversations with suspected undercover officers or with informants in order to protect the dealers' rights against hypothetical police abuse. Numerous other examples exist. The point is an obvious one. Every police encounter would be available for secret recording; even meter maids would not be spared. The value of obtaining probative evidence of occasional official misconduct does not justify a failure to enforce the clear terms of the statute. See *Commonwealth* v. *Blood*, 400 Mass. 61, 74 (1987), and cases cited.

Further, if the tape recording here is deemed proper on the ground that public officials are involved, then the door is opened even wider to electronic "bugging" or secret audio tape recording (both are prohibited by the statute and both are indistinguishable in the injury they inflict) of virtually every encounter or meeting between a person and a public official, whether the meeting or encounter is one that is stressful (like the one in this case or, perhaps, a session with a tax auditor) or nonstressful (like a routine meeting between a parent and a teacher in a public school to discuss a good student's progress). The door once opened would be hard to close, and the result would contravene the statute's broad purpose and the Legislature's clear prohibition of *all* secret interceptions and recordings by private citizens. See *Commonwealth* v. *Thorpe, supra* at 279 ("the Legislature proceeded on the premise that electronic surveillance is anathema except within certain narrowly prescribed boundaries"). See also *Commonwealth* v. *Gonzalez*, 426 Mass. 313, 315 (1997); *O'Sullivan* v. *NYNEX Corp.*, 426 Mass. 261, 263 (1997); *Commonwealth* v. *Blood, supra* at 66. Despite efforts to circumscribe its holding, the dissent, by logi-

271-273 (1996), by no stretch of the imagination did we suggest that it is desirable for citizens to intercept or record electronically the speech of others, including police officers, without their knowledge. We presume that, when police interrogations are electronically recorded, the suspect is aware that the interrogation is being preserved.

cal extension, would permit the untrammeled interception of communications by legislators, executive officers and agents, judicial officials, municipal officers, among others, on the erroneous supposition that public accountability requires the practice. It is not our function to craft unwarranted judicial exceptions to a statute that is unambiguous on its face, and, particularly, not to attempt to do so by subjecting police and public officials to sinister accusations or by evoking unwarranted fears that legitimate interests of the media may be harmed by the statute. See *Commonwealth* v. *Thorpe, supra* at 279-280.[10]

Finally, some comment is in order on the dissent's appeal to the now-famous Rodney King videotape, recorded in Los Angeles, California, by George Holliday on March 3, 1991, *post* at 606-607. The appeal interjects emotional rhetoric into what should be a straightforward matter of statutory interpretation. The California electronic surveillance statute prohibits only the recording of "confidential communication," and excludes "communication made in a public gathering . . . or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded," Cal. Penal Code § 632 (a) and (c) (West 1999), and, therefore, would have no application to Holliday's videotape. As discussed above, however, our Legislature chose not to follow those States whose statutes prohibit wiretapping or secret electronic recording based on privacy rights. See

---

[10]Although not cited by the parties, in *People* v. *Beardsley*, 115 Ill. 2d 47 (1986), a defendant appealed from his conviction of eavesdropping when, having been arrested and placed in the rear seat of a squad car, he secretly tape recorded the conversation of two police officers who sat in the front seat. See *id.* at 49. The Supreme Court of Illinois reversed the defendant's conviction, holding that, although the plain language of the Illinois eavesdropping statute prohibited the recording of "all or any part of any conversation" without consent, Ill. Ann. Stat. c. 38, § 14-2 (a) (1) (1983), the statute must have been intended to protect individuals only from the surreptitious monitoring of conversations of a private nature. See *id.* at 53 (reasoning that, because officers were aware that the defendant was in a position to overhear, their conversation was not private). The Illinois Legislature, however, subsequently amended the statute to define "conversation" as "any oral communication between 2 or more persons regardless of whether one or more of the parties intended their communication to be of a private nature." 720 Ill. Comp. Stat. § 5/14-1(d) (West 1996). See *People* v. *Nestrock*, 316 Ill. App. 3d 1, 7 (2000).

notes 5 and 6, *supra.* "If the Legislature had intended to [prohibit only secret recording where an individual has a reasonable expectation of privacy], the statute would have been written in terms similar to those used in the California eavesdropping statute . . . . Rather, it is apparent from the Report of the Special Commission on Electronic Eavesdropping, 1968 Senate Doc. No. 1132, that the legislative intent was to impose more stringent restrictions on the use of electronic surveillance devices by private individuals than is done in other States." *Commonwealth* v. *Jackson*, 370 Mass. 502, 506 (1976). There is no basis to ignore the plain language and legislative history of G. L. c. 272, § 99, or our case law interpreting it, in favor of speculation as to how an imaginary scenario might have played out, had the Rodney King episode occurred in Massachusetts and not in California.[11]

The problem here could have been avoided if, at the outset of the traffic stop, the defendant had simply informed the police of his intention to tape record the encounter, or even held the tape recorder in plain sight.[12] Had he done so, his recording would not have been secret, and so would not have violated G. L. c. 272, § 99. See *Commonwealth* v. *Jackson*, *supra* at 507 (no "interception" when defendant was aware his voice was being recorded). Secret tape recording by private individuals has been unequivocally banned, and, unless and until the Legislature changes the statute, what was done here cannot be done lawfully.

*Judgments affirmed.*

[11]The dissent's presumption that Holliday would have been prosecuted, under Massachusetts law, for wilfully committing an interception of an oral communication, is unwarranted. Although the Rodney King videotape visually captured the conduct of the police officers' interaction with King, the recording was virtually inaudible, until electronic enhancements filtered the audio portion to allow the actual commands of the police officers to be heard. See *United States* v. *Koon*, 34 F.3d 1416, 1427 & n.3 (9th Cir. 1994), aff'd in part and rev'd in part, 518 U.S. 81 (1996).

[12]The Commonwealth suggests that the defendant's alleged unruly conduct during the stop was a purposeful attempt to "bait" the officers into saying something improper, which would be duly recorded. The statute requires only that the recording be secret and intentional, and, therefore, it is irrelevant whether the situation was as the Commonwealth claims, or whether the defendant's recording was a sincere effort to protect himself from police harassment.

MARSHALL, C.J. (dissenting, with whom Cordy, J., joins). In the early morning hours of Sunday, March 3, 1991, George Holliday was awakened by a commotion outside his apartment. From his window he saw an African-American man being beaten by uniformed police officers. Holliday did more than watch. He recorded on videotape (with sound) the officers' clubbing the man with fifty-six baton strokes, and kicking him viciously about the head and body.[1] The graphic videotape of the arrest of Rodney King was subsequently viewed on television by millions of Americans, causing a public outcry and leading to a comprehensive investigation of the use of excessive force by the Los Angeles police department. The videotape also served as the catalyst for the formation of The Christopher Commission, established to investigate the incident. The commission concluded that police misconduct was a serious problem within the department, and that major reform efforts were needed. The commission wrote of the importance of the Holliday videotape:

> "Our Commission owes its existence to the George Holliday videotape of the Rodney King incident. Whether there even would have been a Los Angeles Police Department investigation without the video is doubtful, since the efforts of King's brother . . . to file a complaint were frustrated, and the report of the involved officers was falsified."[2]

The videotaped events occurred in Los Angeles. Had they occurred in Massachusetts, under today's ruling Holliday would have been exposed to criminal indictment rather than lauded for

[1] See Witnesses Depict Relentless Beating by Police, Los Angeles Times, Mar. 7, 1991, at B1. See also *United States* v. *Koon*, 34 F.3d 1416, 1424-1425 (9th Cir. 1994), rev'd in part, aff'd in part, 518 U.S. 81 (1996) (convictions affirmed).

[2] Report of the Independent Commission on the Los Angeles Police Department at ii (1991). Holliday's videotape also led to the Federal indictment of four officers, two of whom were convicted of violating King's civil rights by the use of unreasonable force. See *United States* v. *Koon, supra* at 1462.

exposing an injustice.[3] That can be the result only if the Legislature intended the criminal statute, G. L. c. 272, § 99, to apply in these circumstances. It did not. I therefore respectfully dissent.

There is nothing in the legislative history of the wiretapping statute, G. L. c. 272, § 99, in the preamble to the legislation, or in the language of the statute that compels the result reached by the court today. The legislative history makes clear that the intent of the statute, as amended in 1968,[4] is twofold. First, the amendments were designed to authorize and to regulate the government's use of wiretaps and other surveillance devices. See Interim Report of the Special Commission on Electronic Eavesdropping, 1968 Senate Doc. No. 1132, at 1-2 (1968 Report) (commission "desires close judicial supervision over all aspects of the process of eavesdropping and wiretapping as it is performed by law enforcement officers"). Supervision of governmental surveillance and eavesdropping was viewed as necessary to "eliminate the possibility of abuse and add to the public's confidence in the manner in which this statute is employed by law enforcement officials." 1968 Report at 8.

Second, the amendments were intended to protect the privacy of citizens by regulating nongovernmental "surveillance," particularly in two circumstances identified by the Special Commission as posing serious risks to that privacy: (i) the Legislature was concerned about the newly discovered practice of private telephone companies' eavesdropping on the conversa-

---

[3]The court's suggestion, *ante* at 605 n.11, that Holliday would not face prosecution because his 1991 recording was "virtually inaudible" is unwarranted. Electronic recordings are routinely enhanced to clarify the sound. See, e.g., *United States* v. *Carson*, 969 F.2d 1480, 1493 (3d Cir. 1992) (audio enhancement of wiretap surveillance tapes to improve quality); *United States* v. *Vastola*, 915 F.2d 865, 869 (3d Cir. 1990) (same).

[4]The Massachusetts wiretapping statute, G. L. c. 272, § 99, was first enacted in 1920. St. 1920, c. 558, § 1. It was substantially modified in 1959, St. 1959, c. 449, § 1. In 1964, the Senate established a special commission to investigate electronic "eavesdropping" and "wire tapping recording devices." Res. 1964, c. 82. Interim reports were filed in 1967 and 1968. The 1968 amendments to G. L. c. 272, § 99, followed shortly thereafter. St. 1968, c. 738, § 1. See *Commonwealth* v. *Thorpe*, 384 Mass. 271, 280 n.7 (1981), cert. denied, 454 U.S. 1147 (1982).

tions of its private customers[5]; and (ii) the commission heard evidence that new technology had made "eavesdropping devices" or "bugs," such as subminiature transmitters, "readily available" to "private investigators" and "private parties." Even if detected, the commission cautioned, "one can never learn the identity of the eavesdropper." Interim Report of the Special Commission on Electronic Eavesdropping, 1967 Senate Doc. No. 1198 at 3 (1967 Report). The commission recommended that, to protect the privacy of citizens, individuals be prohibited from using these "wiretapping and eavesdropping devices" to record their private conversations.[6] There is no hint in the legislative history that the Legislature contemplated the circumstances at issue in this criminal case: the tape recording of an encounter on a public way between a citizen and a police officer engaged in his official duties.[7]

The 1968 amendments to the wiretapping statute, St. 1968,

[5]During the course of its hearings the Special Commission discovered for the first time that for decades New England Telephone and Telegraph Company had secretly engaged in "service observation practices" in which the company intercepted and recorded customer-to-customer calls and customer-to-company calls. The commission stated that "[w]e cannot understand why apparently no one in the [Department of Public Utilities] thought it outrageous that the company would monitor customer-to-customer calls to gain customer comments on service" (emphasis removed). 1967 Report at 14.

[6]A concurring report filed by two members of the special commission, Elliot B. Cole and William P. Homans, Jr., makes abundantly clear that the "prohibition of wiretapping and eavesdropping by the public" was to protect the privacy of citizens engaged in personal conversations. The two members quoted from a letter to the commission by Professor Alan Westin, the author of Privacy and Freedom, expressing his opposition to "one-party consent" provisions. Professor Westin explained that one-party consent provisions inhibit a person "to speak frankly and freely in personal conversation." Professor Westin refers to a 1958 opinion by West Germany's highest civil court against one-party "surveillance," in which the opinion notes "that the individual expresses his personality in *private conversation*, and has a right to do so freely, without distrust and suspicion" (emphasis added). 1968 Report at 12 (concurring report).

[7]Audio tape recorders (the device at issue in this criminal case) were hardly new technology in 1968. The 1967 Report makes clear that what concerned the Legislature were "eavesdropping devices" ("bugs") and other sophisticated inventions of then-recent origin that could be concealed in telephones or walls, and could "transmit a very clear signal at least 7 blocks in downtown Boston and can pick up a whisper at 20 feet." See 1967 Report at 3.

c. 738, § 1, at issue here, were enacted shortly after the special commission's report, and reflect these same two purposes. First, the statute authorized the police to engage in secret electronic surveillance of citizens suspected of organized crime: The statutory preamble notes that "[n]ormal investigative procedures are not effective" in combating the "increasing activities of organized crime" and that "law enforcement officials must be permitted to use modern methods of electronic surveillance . . . when investigating these organized criminal activities." *Id.*[8]

Second, the Legislature noted that the "uncontrolled development and unrestricted use of modern electronic devices" posed grave dangers to the "privacy of all citizens of the commonwealth." With these twin objectives in mind, the Legislature placed substantial restrictions on "surveillance" and "eavesdropping" by government officials. See *Commonwealth* v. *Gordon*, 422 Mass. 816, 833 (1996) ("It is apparent from the preamble that the legislative focus was on the protection of privacy rights and the deterrence of interference therewith by law enforcement officers' surreptitious eavesdropping as an investigative tool"). The Legislature also restricted "surveillance" and "eavesdropping" by private individuals to protect those same privacy interests. See *Commonwealth* v. *Jackson*, 370 Mass. 502, 507 (1976) (statutory language and legislative policy of "protecting the privacy of our citizens"). To that end the Legislature both prohibited "interceptions," and provided a

---

[8]It is clear that authorizing electronic wiretapping to combat organized crime was the primary focus of the 1968 amendments to the statute. See 1968 House Doc. No. 3797, Message from His Excellency the Governor Recommending Legislation to Assist Law Enforcement Officials to Combat Crime in the Commonwealth, Feb. 6, 1968 (The "shocking events of the last few days" demonstrate the need to "enact an electronic surveillance law that allows law enforcement officials to obtain evidence . . . by striking at the communications links essential to the operation of criminal organizations"). The "shocking events" referred to by Governor John A. Volpe involved an attack on attorney John E. Fitzgerald, Jr., who lost a leg and nearly died after organized crime members placed a bomb in his vehicle. See Barboza's Lawyer Loses Leg in Everett Dynamite Blast, Boston Globe, Jan. 31, 1968, at 1. Attorney Fitzgerald represented Joseph (Barboza) Baron, an informer who was the star witness in a trial of four men accused of a gangland murder. *Id.* See also The Rule of Terror, Boston Globe, Feb. 1, 1968, at 14 ("[t]he underworld struck at the very core of ordered society Tuesday when it nearly killed . . . counsel for gangland informer").

civil remedy for any person "aggrieved" by such "intercep-tions," described by the Legislature as one who "ha[s] standing to complain that his . . . privacy was invaded in the course of an interception." G. L. c. 272, § 99 B 6 and Q. The legislative intent as reflected in the statutory language is explicit: to protect the privacy interests of citizens. While the statutory language enacted to accomplish these purposes can be broadly read, there is no suggestion that the Legislature had in mind outlawing the secret tape recording of a public exchange between a police of-ficer and a citizen.

The criminal conviction of Michael Hyde is (apparently) the first time that a citizen of Massachusetts has been convicted because he tape recorded an exchange with a police officer performing an official function in a public place in the presence of a third party, potentially within the sight and hearing of any passerby.[9] Now to hold, as the court does, that a police officer possesses a privacy interest in statements he makes as a public officer effectuating a traffic stop sets the jurisprudence of this Commonwealth apart from all others.

Many States have wiretapping statutes similar to the one enacted in 1968 in Massachusetts.[10] In only one reported deci-sion has a State attempted to indict a citizen in circumstances similar to those in this case. The attempt was summarily rejected. In *State* v. *Flora*, 68 Wash. App. 802 (1992), the court overturned a conviction obtained in circumstances nearly identi-cal to these and under a wiretapping statute similar to the one at issue here. The *Flora* court rejected as "wholly without merit" the view now adopted by this court. *Id.* at 806. The court "decline[d] the State's invitation" to transform its wiretapping

---

[9]The Commonwealth points to no other convictions, nor even an indict-ment, in circumstances such as these.

[10]The court is correct that the Massachusetts statute is more restrictive than some other States, but not for the reasons it suggests. *Ante* at 599-600. In *Commonwealth* v. *Jackson*, 370 Mass. 502, 506 & n.6 (1976), we distinguished our statute from those in other States that permit so-called "one-party consent." Our Legislature did reject the use of one-party consent surveillance (see note 6, *supra*), but the Legislature made abundantly clear that its intent was to curtail "surveillance" in order to protect the privacy of citizens. See *Commonwealth* v. *Jackson*, *supra* at 505.

statute "into a sword available for use against individuals by public officers acting in their official capacity." *Id.* at 808.[11]

This court's attempt to distinguish *State* v. *Flora, supra* at 610, as "inapposite" because the "Washington electronic surveillance statute prohibits only the secret recording of private conversations" is not persuasive. *Ante* at 600-601 n.6.[12] Like its Washington counterpart, the Massachusetts statute protects, as it was intended to, the privacy of citizens. See G. L. c. 272, § 99 B 6 ("aggrieved person" is one whose "privacy was invaded in the course of an interception").[13] Both the language of the

---

[11]In one other case, also referred to by the court, *ante* at 604 n.10, *People* v. *Beardsley*, 115 Ill. 2d 47 (1986), the defendant was convicted of eavesdropping when he recorded the conversation of two police officers sitting in the front seat of a police squad car, while he was in the back. The Supreme Court of Illinois reversed the conviction, noting that the police officers knew he had a tape recorder with him, which he had been openly using only minutes before. *Id.* at 55. The Legislature of Illinois had amended its wiretapping statute to prohibit the recording of any conversation unless all parties consented, as the Massachusetts statute requires. Although the police in that case had not consented to the recording, the Illinois court held that the amendment "does not alter the basic concept of the conduct at which the statute is aimed . . . a surreptitious interception of a private conversation . . . listening in secret to what is said in private." *Id.* at 58. As the court notes, *ante* at 604 n.10, eight years later, the Illinois Legislature amended its wiretapping statute to prohibit the secret recording of conversations "regardless of whether one or more of the parties intended their communication to be of a private nature." 720 Ill. Comp. Stat. § 5/14-1(d) (West 1996). See *In re Marriage of Deborah Almquist*, 299 Ill. App. 3d 732, 736 (1998) (Illinois General Assembly added definition of "conversation" to the eavesdropping statute by Pub. Act 88-677, effective December 15, 1994). The Massachusetts wiretapping statute contains no such provision.

[12]The court also attempts to distinguish *Commonwealth* v. *Henlen*, 522 Pa. 514, 517 (1989). *Ante* at 604 n.6. In that case a prison guard suspected of theft recorded his interrogation by police. The court held that the parties did not have a protected privacy interest, and there was no violation of the Pennsylvania statute. *Id.* That case is akin to *Commonwealth* v. *Gordon*, 422 Mass. 816, 833 (1996), in which we also held that the secret videotaping of the defendants' booking at the police station was not a violation of the wiretapping statute, because the Legislature did not "appear to have had in mind the recording of . . . booking steps following an individual's arrest."

[13]Contrary to the court's suggestion, *ante* at 601 n.7, *Commonwealth* v. *Voight*, 28 Mass. App. Ct. 769, 771-773 (1990), did not establish that police officers, acting in their official capacity, are "persons" entitled to statutory protection. The court in *Voight* correctly expressed that public officials acting in their official capacity are not generally considered "persons" unless expressly designated. *Id.* at 771, citing G. L. c. 4, § 7 Twenty-third.

statute and its legislative history make clear that the Legislature was concerned only with protecting the secret recording of conversations in which there was a legitimate expectation of privacy. None exists here.

The purpose of G. L. c. 272, § 99, is not to shield public officials from exposure of their wrongdoings. I have too great a respect for the Legislature to read any such meaning into a statute whose purpose is plain, and points in another direction entirely. Where the legislative intent is explicit, it violates a fundamental rule of statutory construction to reach a result that is plainly contrary to that objective. See *Commonwealth* v. *Gordon, supra* at 832-833 (court declined to read wiretapping statute "literally" in "absence of more specific statutory language" that broad definition of interception outlawed unconsented audiotaping of booking procedures, noting that "in light of the preamble, we are unwilling to attribute that intention to the Legislature"). See *Commissioner of Pub. Works* v. *Cities Serv. Oil Co.*, 308 Mass. 349, 360 (1941) (statutes are to be interpreted "in the light of the Constitution and of the common law, to the end that they be held to cover the subjects presumably within the vision of the Legislature" and "be not stretched" to "comprehend matters not within the principle and purview on which they were founded"). "The public has an interest in knowing whether public servants are carrying out their duties in an efficient and law-abiding manner." *Attorney Gen.* v. *Collector of Lynn*, 377 Mass. 151, 158 (1979). To hold that the Legislature intended to allow police officers to conceal possible misconduct behind a cloak of privacy requires a more affirmative showing than this statute allows.

In our Republic the actions of public officials taken in their public capacities are not protected from exposure. Citizens have a particularly important role to play when the official conduct at issue is that of the police. See *Rotkiewicz* v. *Sadowsky*, 431 Mass. 748, 754 (2000) (recognizing importance of "public discussion and public criticism directed toward the performance" of police officers). Their role cannot be performed if citizens must fear criminal reprisals when they seek to hold government officials responsible by recording — secretly recording on occasion — an interaction between a citizen and a police officer.

The court suggests, *ante* at 602-603, that a different reading would permit "untrammeled interception of communications" of government officials by everyone and anyone. That concern is misplaced. There is a difference in kind, well recognized in our jurisprudence, between police officers, who have the authority to command citizens, take them into custody, and to use physical force against them, and other public officials who do not possess such awesome powers.[14] We hold police officers to a higher standard of conduct than other public employees, and their privacy interests are concomitantly reduced. See, e.g., *O'Connor* v. *Police Comm'r of Boston*, 408 Mass. 324, 328-329 (1990) ("public confidence in the police is a social necessity and is enhanced by procedures that deter [unlawful police conduct]"); *Broderick* v. *Police Comm'r of Boston*, 368 Mass. 33, 42 (1975), quoting *Gardner* v. *Broderick*, 392 U.S. 273, 277-278 (1968) (police officer "is a trustee of the public interest, bearing the burden of great and total responsibility to his public employer"). We hold officers to this higher standard of conduct, fully confident that, in most cases, they will meet that standard, and there is no "implicit" suggestion to the contrary. *Ante* at 602. It is the recognition of the potential for abuse of power that has caused our society, and law enforcement leadership, to insist that citizens have the right to demand the most of those who hold such awesome powers.[15]

The court's ruling today also threatens the ability of the press — print and electronic — to perform its constitutional role of watchdog. As the court construes the Massachusetts wiretapping statute, there is no principled distinction to explain why members of the media would not be held to the same standard

---

[14]The court's suggestion, *ante* at 603, that undercover police officers engage in the type of conduct to which Michael Hyde was subjected lacks any support. Undercover officers inhabit a unique position in the world of law enforcement, and daily face perilous situations while concealing their identity as police officers. Because of the covert and hazardous nature of their important work, such conduct can hardly be contemplated because it would place them in even greater jeopardy than they already are.

[15]Boston Police Commissioner Paul F. Evans has said that holding officers under his command to the highest ethical standards is a priority: "The integrity of the department is the most important concern I have [and] when the department's trust and integrity is questioned I am going to respond." See An Outside Review for Hub Police, Boston Globe, Sept. 17, 1997, at A1.

as all other citizens. See, e.g., *Associated Press* v. *NLRB*, 301 U.S. 103, 122-133 (1937) ("The publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others"). See also *Branzburg* v. *Hayes*, 408 U.S. 665, 682 (1972) ("It is clear that the First Amendment [to the United States Constitution] does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability"). The statute, on its face, makes no exception for members of the media or anyone else. Had Michael Hyde, the defendant in this case, been a news reporter he could have faced the same criminal consequences that the court now sanctions.[16] If the statute reaches actions by police officials acting in their public capacities in the plain view of the public, the legitimate news gathering of the media is most assuredly implicated.

I would reverse the conviction.

---

[16]The scope of the court's ruling encompasses any citizen stopped by the police, not just those who may have violated some law. No traffic citation was issued to Michael Hyde, and he was not charged with any crime.