NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12835

COMMONWEALTH  vs.  JEROME MORRIS.

Plymouth.     November 7, 2022. - July 25, 2023.

Present:  Budd, C.J., Gaziano, Cypher, Kafker, Wendlandt, &
Georges, JJ.


Homicide.  Firearms.  Electronic Surveillance.  Telephone.
    Constitutional Law, Admissions and confessions, Waiver of
    constitutional rights.  Evidence, Admissions and
    confessions, Tape recording, Redirect examination.
    Practice, Criminal, Capital case, Motion to suppress,
    Admissions and confessions, Argument by prosecutor.



    Indictments found and returned in the Superior Court
Department on January 2, 2015.

    A pretrial motion to suppress evidence was heard by
Cornelius J. Moriarty, II, J., and the cases were tried before
Gregg J. Pasquale, J.


    Cathryn A. Neaves for the defendant.
    Mary Nguyen, Assistant District Attorney, for the
Commonwealth.


    WENDLANDT, J.  The defendant, Jerome Morris, was convicted

of murder in the first degree on the theory of deliberate

premeditation in connection with the August 2014 shooting of the

victim, Quentin Phillip.[1]  Following a verbal altercation with the victim outside a bar in Brockton, the defendant walked away, retrieved a firearm from a friend, and converged on a vehicle in which the victim and his three friends were sitting.  The victim was seated in the rear passenger's seat; the defendant took aim at the rear passenger's seat window and fired at least two shots at the window.  One hit the victim in the chest, killing him.  The defendant, who was caught on a video surveillance camera arguing with the victim and then retrieving a firearm just prior to the killing, admitted to discharging the firearm at the vehicle's window during a police station interrogation following his arrest and waiver of his Miranda rights; the surveillance camera footage and a recording of the interrogation were introduced at trial.  The defendant argued at trial that the killing occurred in self-defense, contending that he believed the victim was armed.

On his direct appeal, the defendant contends that his statement at the police station should have been suppressed because police officers impermissibly recorded it without his express consent, in violation of G. L. c. 272, § 99 (wiretap statute).  In addition, he maintains that the statement should

---

[1] The defendant also was convicted of unlawful possession of a firearm and unlawful discharge of a firearm within 500 feet of a building.

have been suppressed because he was not informed promptly of his right to make a telephone call and only was permitted a call after his interrogation, in violation of G. L. c. 276, § 33A. He further asserts that the prosecutor improperly referred to omissions in his statement to police officers. The defendant also asks the court to exercise its authority under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial. Finally, the defendant requests that we vacate his conviction of unlawful possession of a firearm in light of our recent opinion in Commonwealth v. Guardado, 491 Mass. 666 (2023). We affirm the convictions other than the unlawful possession conviction and discern no reason to grant relief under G. L. c. 278, § 33E.

1. Background. a. Facts. The following facts are supported by the evidence admitted at trial. Certain details are reserved for discussion of specific issues.

i. Surveillance footage and witness testimony. Shortly after 2:10 A.M. on August 9, 2014, the victim was fatally shot in the chest while seated in the rear passenger's seat of a vehicle that was exiting the parking lot of a Brockton bar.

Approximately twenty minutes prior to the killing, the victim and the defendant verbally argued outside the bar. During the confrontation, which lasted several minutes, the victim looked angry, but the defendant appeared calm. The

victim called the defendant a "bitch" in an aggravated tone. Surveillance footage of the argument captured the victim waving his arms and appearing to push the defendant.

The defendant and the victim separated; the victim went to a vehicle with his friends. The victim initially stood outside the vehicle, seemingly frustrated and angry. The victim then sat in the rear passenger's seat, talking to his friends, and making plans for where next to go. The vehicle doors were closed, and the windows, which were "very" tinted, were shut. The victim asked one friend to "pass [him] that"; the friend responded by telling the victim, "Chill." The victim said, "I don't trust these n*ggas," a phrase he repeated multiple times.

Meanwhile, the defendant retrieved an item, later determined to be a firearm, from one of his friends in the parking lot. With the firearm in hand, the defendant walked toward the vehicle in which the victim's group were sitting.

The victim's group, which had been waiting in the vehicle for another friend, soon learned that the friend would not join them; the defendant silently approached the rear passenger's window next to where the victim was sitting. The victim either was using his cell phone or was talking to the other passengers about their plans. The victim had his hand in his pocket. He

was not facing the window.[2]  Upon noticing the defendant approaching, the victim said, "What's wrong with these dudes?" and one of the victim's friends either warned, "[Y]our people's coming to the door," or asked, "What does he want?"  As the vehicle was slowly driven out of the parking lot, the defendant fired multiple gunshots into the rear passenger's side window; one bullet struck the victim in the chest.

The defendant fled.  Surveillance footage shows the defendant handing the firearm to someone and continuing to run away.

Minutes later, the victim arrived at a hospital, where he was pronounced dead.  The cause of death was a gunshot wound to the chest.

The victim was not seen with a firearm that night, no firearm was seen or found in the vehicle, and no gunshot residue was found on the victim's hands.

ii.  Defendant's statement.  The defendant was identified from the surveillance footage by the mother of one of his children.  He was arrested, and after being given the Miranda warnings and waiving his rights, the defendant was interviewed at a police station.  The interrogation was audio and video

---

[2] A medical examiner later testified that the victim was shot from the front, but at an angle, with the bullet entering the top of his right chest and exiting the bottom of his left chest.

recorded; a redacted copy of the recording was played for the jury.  In the interrogation, the defendant admitted that he fired two shots at the vehicle window, behind which sat the victim.

The defendant explained that, prior to the shooting, he "went outside to talk with" the victim after the victim "called [him] outside."  The victim asked the defendant if the two of them "had a problem"; the defendant responded that if they did, he "would've [already] did [sic] something to [the victim]." The victim called the defendant "soft" and a "bitch," and he stated that the defendant would not have done anything.  At that moment, the defendant offered to fight the victim; but the victim refused, asserting that he did not want to ruin his night.  The victim also said, "I'm a see you when I see you," "You already know what time it is with me," and "When I see you, it's on."  The victim told the defendant that he "stays with it," which the defendant understood to mean that the victim had a firearm that night.

The defendant claimed that he was worried that something would happen to him -- that he would be "caught in the crossfire" -- and that he "just honestly thought about [his] kids."  The defendant explained that the victim was "a shooter," unlikely to engage in hand-to-hand fighting; the defendant did

not want someone like that "on [his] back . . . [t]rying to shoot at [him] while [he's] with [his] family."

The defendant continued, asserting that he saw the victim behind a vehicle looking at him, "acting mad shifty," and "making motions . . . like he was about to do something" or "take cover."  The defendant thought the victim was "acting kinda funny like he got somethin' or somethin'," as if "he had a weapon."  The defendant claimed that he was going to leave, because he did not have a weapon and he thought that the victim did, but he was worried that the victim was waiting for him.

The defendant said that he had told his friends what had transpired with the victim; they asked him if he was going to "let that shit ride."  Responding, he said he was not going to "try to run up on somebody [he felt] as though had a weapon on him."  One of the defendant's friends offered the defendant a firearm, which he took, saying, "Let me see it.  I'm gonna go see what's up."  The defendant walked to the passenger's side of a vehicle and shot twice at the rear window, behind which sat the victim.  The defendant then handed the firearm to someone and fled.

b.  Procedural history.  The defendant was indicted on one count of murder, in violation of G. L. c. 265, § 1; one count of unlawful possession of a firearm, in violation of G. L. c. 269, § 10 (a); and one count of unlawful discharge of a firearm

within 500 feet of a building, in violation of G. L. c. 269, § 12E.  The defendant filed a motion to suppress his postarrest statement to investigators, which was denied after an evidentiary hearing.

At trial, the Commonwealth introduced a redacted recording of the defendant's interrogation.  The jury found the defendant guilty of murder in the first degree on the theory of deliberate premeditation; the defendant was sentenced to life without parole.[3]  The defendant timely appealed, and subsequently filed in this court a motion for a new trial, submitting arguments pursuant to Commonwealth v. Moffett, 383 Mass. 201, 208-209 (1981).[4]

2.  Discussion.  On appeal, the defendant raises several issues, as set forth supra.  We address each in turn.

a.  Motion to suppress statements made to investigators. The defendant argues that the motion judge erred in denying his

_____

[3] The defendant also was found guilty of unlawful possession of a firearm and unlawful discharge of a firearm within 500 feet of a building.  The defendant was sentenced to a term of from two and one-half years to two and one-half years and a day in State prison, concurrent with his life sentence, as to the former, and to a term of three months in the house of correction as to the latter, deemed served at the time of sentencing.

[4] See Moffett, 383 Mass. at 208 ("If appointed counsel, on grounds of professional ethics deems it absolutely necessary to dissociate himself or herself from purportedly frivolous points, counsel may so state in a preface to the brief," but still should "present the [points] succinctly in the brief").

motion to suppress his postarrest statements to investigators on two grounds, discussed infra. "In reviewing a decision on a motion to suppress, we accept the judge's subsidiary findings absent clear error but conduct an independent review of [the] ultimate findings and conclusions of law" (citation and quotations omitted). Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).[5] We review video footage independently. See Commonwealth v. Yusuf, 488 Mass. 379, 380-381 (2021). And "[w]e review questions of statutory interpretation de novo." Conservation Comm'n of Norton v. Pesa, 488 Mass. 325, 331 (2021).

i. Recording under wiretap statute. The defendant argues that the recording of his police station statement, after police officers read to him, and he waived, his Miranda rights, was a "secret recording" prohibited by the wiretap statute.

---

[5] We supplement the motion judge's subsidiary findings with "evidence from the record that 'is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony.'" Jones-Pannell, 472 Mass. at 431, quoting Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008). We do so "only so long as the supplemented facts 'do not detract from the judge's ultimate findings.'" Jones-Pannell, supra, quoting Commonwealth v. Jessup, 471 Mass. 121, 127-128 (2015).

Accordingly, he maintains that his motion to suppress the recording should have been allowed.[6]

A. Wiretap statute. The wiretap statute makes it a crime to "willfully commit[] an interception . . . of any . . . oral communication." G. L. c. 272, § 99 C 1. The term "interception" is defined as "to . . . secretly record . . . the contents of any . . . oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G. L. c. 272, § 99 B 4. A defendant whose oral communications have been intercepted in violation of the statute may bring a motion to suppress the contents of unlawfully intercepted communications and evidence derived therefrom. G. L. c. 272, § 99 P.

B. Motion judge's findings and video footage. The motion judge made the following findings of fact. The defendant was arrested at approximately 12:30 P.M. and taken to the Brockton police station and into an interview room, where an interrogation began at 1:11 P.M. The defendant was advised of

---

[6] The defendant also argues cursorily that the investigators failed to inform the defendant of the camera in order to "lull[ the defendant] into a false sense of security that they were having a 'cozy chat.'" The defendant cites nothing in the record to buttress this allegation, and the tenor of the interrogation, as reflected in the recording, does not support the defendant's claim of an illicit scheme.

his Miranda rights and his right to a prompt arraignment; he indicated that he understood his rights and signed written waivers of these rights. The interrogation, which was recorded by an audio-visual electronic recording device in the interrogation room, lasted a little longer than one hour.

The recording device did not look like a traditional camera; instead, its physical structure resembled a thermostat or motion sensor. The defendant was not notified that his statement was being recorded by electronic means. There was no sign indicating that there was a recording device in the interrogation room. The motion judge rejected the Commonwealth's suggestion that a small sign on the door between the garage and adjacent police station, which stated "Audio Monitoring on These Premises," was sufficient to notify the defendant that his interrogation was being recorded by electronic means.[7]

Although finding that the defendant did not receive actual or constructive notice of the electronic recording, the motion

---

[7] In discussing the defendant's Miranda waiver, the motion judge noted that the defendant "has extensive experience with the criminal justice system," having signed Miranda waivers on six prior occasions. Each of these occasions occurred after the court's decision in Commonwealth v. DiGiambattista, 442 Mass. 423, 447-448 (2004) (expressing "preference that [custodial interrogations] be recorded whenever practicable"). The officers knew of at least some of the defendant's prior criminal justice system history.

judge concluded that, because the defendant was advised that anything he said could and would be used against him in court, the recording was not surreptitious eavesdropping in violation of the wiretap statute.

In addition, the interrogation footage captured each officer taking written notes during portions of the interrogation.  Before the defendant's admission that he twice shot at the victim, the defendant was prompted by one police officer:  "This is where the people that listen to your story later on determine whether you really care about someone other than yourself, and you want to tell the truth and . . . be remorseful . . . and explain what you did and why you did it. That's where your role comes in now."  A short while later, the officer added, "[I]f you're not gonna tell the truth, it's not gonna look good for you."

C.  Recording of interrogation.  The defendant's argument requires us to construe the wiretap statute and determine whether the statute criminalizes the electronic recording of a defendant's voluntary statement to police officers under circumstances where the defendant understands that the statement can and will be used against him and nonetheless decides to proceed with the interrogation, the defendant is informed that the interrogation presents an opportunity to relay his narrative for future listening, and the defendant understands that

officers are recording the statement (or parts thereof) in writing. This requires a legal determination, which we consider de novo, Pesa, 488 Mass. at 330-331; Jones-Pannell, 472 Mass. at 431, based on the factual findings by the motion judge.

Our opinion in Commonwealth v. Rainey, 491 Mass. 632 (2023), is instructive. There, unbeknownst to the person giving a statement to police officers (a victim of domestic violence), her voluntary statement was recorded by an electronic recording device -- a body-worn camera. Id. at 634. Nonetheless, the victim, like the defendant in this case, understood that her statement was being preserved; indeed, the victim, like the defendant here, spoke to the police officers for the purposes of memorializing her statement, and the video footage shows police officers taking written notes during portions of her statement. Id. at 635, 643-644. The defendant in Rainey, like the defendant here, nonetheless maintained that the recording was a "secret recording" in violation of the wiretap statute because the victim was unaware of the police officer's electronic recording device. Id. at 640.

We acknowledged in Rainey that "subsection 99 C of the wiretap statute could be construed literally as the defendant suggests" to criminalize the recording of the victim's voluntary statement. Id. at 642. However, given the absurdity of such a result, we declined to adopt such a construction because "in the

absence of more specific statutory language to that effect
. . . , we [were] unwilling to attribute that intention to the
Legislature."  Id., quoting Commonwealth v. Gordon, 422 Mass.
816, 832-833 (1996).  Rather, we concluded that the statute did
not prohibit the admission of the recording in question because
"nothing in the wiretap statute as a whole, including its
codified preamble, evince[d] an intent to prohibit recording a
victim's volunteered report of a crime where . . . the victim
was aware that officers already were memorializing her report in
writing."  Rainey, supra at 643.  Indeed, as we explained, the
"legislative focus [of the wiretap statute, as set forth in the
statute's preamble,] was on the protection of privacy rights and
the deterrence of interference therewith by law enforcement
officers' surreptitious eavesdropping as an investigative tool."[8]
Id., quoting Gordon, supra at 833.  See Gordon, supra

---

[8] "In pertinent part, the preamble of the wiretap statute
codified the Legislature's finding that 'organized crime'
existed in the Commonwealth and was 'a grave danger to the
public welfare and safety.'  G. L. c. 272, § 99 A.  The
Legislature concluded that '[n]ormal investigative procedures'
were 'not effective in the investigation of illegal acts
committed by organized crime' and that 'law enforcement
officials must be permitted to use modern methods of electronic
surveillance, under strict judicial supervision, when
investigating these organized criminal activities.'  Id.  The
preamble also codified the Legislature's recognition that 'the
uncontrolled development and unrestricted use of modern
electronic surveillance devices pose grave dangers to the
privacy of all citizens of the [C]ommonwealth.'  Id."  Rainey,
491 Mass. at 643 n.20.

(concluding, in view of legislative purpose of wiretap statute, that it does not prohibit recording of booking procedures in police station).[9]  See also Rainey, supra at 642 (collecting cases turning to preamble to inform analysis of wiretap statute).  The Legislature, we concluded, did not have in mind the type of voluntary statement given by the victim, much less to sanction criminally the conduct of police officers who preserved the victim's voluntary statement to them.  Rainey, supra at 643-644.

Similarly, here nothing in the statute as a whole, including its codified preamble, supports the conclusion that the Legislature intended to criminalize the police officers' recording of the defendant's voluntary statement, which the

---

[9] Our decision in Gordon did not rest, as the defendant suggests, on the ground that the electronic recording in that case "did not capture or reveal the defendants' thoughts or knowledge about some fact or subject."  Gordon, 422 Mass. at 833.  Indeed, it is pellucid that the wiretap statute does not use the content of the recording as a trigger for a violation. See G. L. c. 272, § 99 C 1 ("Proof of the installation of any intercepting device by any person under circumstances evincing an intent to commit an interception . . . shall be prima facie evidence of a violation . . ." [emphasis added]).  Our reasoning in Gordon, as we explained in Rainey, centered on the Legislature's intent, as evinced in the wiretap statute's preamble, see note 8, supra, to prohibit surreptitious eavesdropping, see Rainey, 491 Mass. at 643, citing Gordon, supra at 832-833; because the Legislature did not appear to have in mind the recording of a booking procedure at the police station, we did not adopt the literal construction urged by the defendant, Gordon, supra at 832-833.

defendant understood was being preserved for future use in connection with the investigation of the crime about which the defendant was speaking voluntarily. The recording "was not used as an investigative tool to secretly eavesdrop on an otherwise private conversation";[10] rather, it captured the defendant's "voluntary statement to police officers, which [the defendant] knew was being memorialized by them in writing." Rainey, 491 Mass. at 643-644. Indeed, the officers explained to the defendant that the interrogation provided him an opportunity to tell his own story, and the defendant proceeded to do so knowing

---

[10] We agree with the defendant that the relevant question for purposes of the wiretap statute is not whether the defendant had a reasonable expectation of privacy. See Rainey, 491 Mass. at 644 n.21; Commonwealth v. Jackson, 370 Mass. 502, 506 (1976) ("we would render meaningless the Legislature's careful choice of words if we were to interpret 'secretly' as encompassing only those situations where an individual has a reasonable expectation of privacy"). Thus, our conclusion does not rest on a determination whether the defendant's rights under the Fourth Amendment to the United States Constitution or art. 14 of the Massachusetts Declaration of Rights were violated. See, e.g., Commonwealth v. DeJesus, 489 Mass. 292, 295 (2022) (defendant may challenge search or seizure under Fourth Amendment or art. 14 only if defendant has reasonable expectation of privacy). The wiretap statute evinces the Legislature's intent to provide broader protections than those provided by the State and Federal Constitutions. Accordingly, our analysis is guided by the Legislature's intent as set forth in the words of the statute, in the context of the statute as a whole. See Harvard Crimson, Inc. v. President & Fellows of Harvard College, 445 Mass. 745, 749 (2006) ("Courts must ascertain the intent of a statute from all its parts and from the subject matter to which it relates, and must interpret the statute so as to render the legislation effective, consonant with sound reason and common sense").

that the statement would be preserved for later review.  In

particular, the defendant was warned that his statements could

and would be used against him in a court of law and was reminded

that individuals would "listen" to his statement.  Presumably,

he also saw the police officers, who were seated next to him,

taking notes during his statement.[11]  Regardless of whether the

defendant recognized the electronic recording device as a

thermostat, motion sensor, or camera, it strains credulity to

conclude that the defendant did not understand that his

statement was being memorialized.  "The resulting video footage

was not a clandestine recording precluded by the wiretap

---

[11] We do not, as the concurring justice suggests, ignore that the wiretap statute prohibits both secretly hearing and secretly recording.  See G. L. c. 272, § 99 B 4 (defining "interception" as to "secretly hear" or "secretly record").  Our decision does not rest on the fact that the officers heard the defendant's statement.  As in Rainey, we simply decline to attribute to the Legislature an intent to prohibit electronically recording a defendant's voluntary statement in circumstances where the defendant knows that his statement is being recorded by other means -- here, by use of a writing implement and paper.  See Rainey, 491 Mass. at 644 n.22, quoting Commonwealth v. Moody, 466 Mass. 196, 209 (2013) ("'record' as used in the wiretap statute should be given its plain and ordinary meaning to 'mean, "to set down in writing" or "to cause [sound, visual images] to be transferred to and registered on something by electronic means in such a way that the thing so transferred and registered can . . . be subsequently reproduced"'").  See Moody, supra ("secretly record" as used in wiretap statute "includes the interception of text messages by viewing and transcribing them for use at a later date" [emphasis added]).  A reading requiring suppression under the circumstances is without any foundation in the Legislature's intent, as expressed in the codified preamble.

statute; rather, it merely preserved the statement (albeit through an alternative, electronic medium) that the [defendant] voluntarily gave to law enforcement officers and which []he understood was being recorded by them by means of paper and pen." Id. at 644. See Commonwealth v. Ashley, 82 Mass. App. Ct. 748, 762 (2012), cert. denied, 571 U.S. 838 (2013) (wiretap statute did not criminalize use of camera in police station interrogation room to record defendant's volunteered statement to officers when officers "repeatedly expressed their intention to get it 'down on paper' and memorialize the interview"). Accord Commonwealth v. Hyde, 434 Mass. 594, 602 & n.9 (2001) (contrasting "clandestine recording" prohibited by wiretap statute with "good practice" of electronic recording of police interrogations based on presumption "that, when police interrogations are electronically recorded, the suspect is aware that the interrogation is being preserved").

ii. Denial of right to telephone call. The defendant next maintains that his statement should have been suppressed because he was denied his right to make a telephone call in violation of G. L. c. 276, § 33A. Section 33A provides:

> "The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be

<u>informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter</u> (emphasis added)."

Although the statute does not set forth a statutory remedy for a violation of the defendant's right, we have applied the exclusionary rule to evidence gathered as a result of a violation of the statute where the defendant can show that the violation was intentional.  See Commonwealth v. Walker, 466 Mass. 268, 278 (2013); Commonwealth v. Alicea, 428 Mass. 711, 716 (1999); Commonwealth v. Jones, 362 Mass. 497, 502 (1972).

A.  Motion judge's findings.  The motion judge made the following findings of fact.  After the defendant, at the Brockton police station, waived his Miranda and prompt arraignment rights, at 1:13 P.M., the defendant was advised that he would be afforded a telephone call when he was taken to booking; but the defendant was not told when he would be taken to booking.  More than one hour later, toward the end of the interrogation, an officer asked the defendant if he wanted to call his parents; the defendant responded that he would like to call his children and the mothers of his children, but "not right [then]."  The defendant soon thereafter was taken to booking and advised of his right to make a telephone call.

The defendant had prior experience with the criminal justice system.  In particular, on ten prior occasions, after

being arrested and booked at the Brockton police station, the defendant had been informed of, and utilized, his right to make a telephone call.

The motion judge concluded that G. L. c. 276, § 33A, was violated because the defendant neither was advised of his right to make a telephone call upon his arrival at the police station nor afforded the right to use a telephone within one hour of his arrival. The motion judge found that the violation, however, was unintentional, relying on the testimony of the police officers, corroborated by the video footage, that they promptly informed the defendant of his Miranda and arraignment rights. The motion judge also relied on the defendant's "prior experience with the criminal justice system," specifically his prior bookings.[12] Accordingly, the motion judge denied the defendant's motion to suppress.

B. Unintentional violation of telephone call right. The defendant contends that the motion judge's finding that the violation of G. L. c. 276, § 33A, was unintentional was erroneous. We review the finding of the motion judge, who directly heard the testimony of the arresting officers, for clear error. Jones-Pannell, 472 Mass. at 431. See Ashley, 82

---

[12] The motion judge made no finding as to whether the officers knew of this criminal history, outside of the defendant's outstanding probation arrest warrant.

Mass. App. Ct. at 759 (reviewing judge's rejection of intentional motive for clear error). In support of this argument, the defendant points to the evidence that one of the police officers told the defendant that he would have the "opportunity" to make a telephone call later but did not, at that time, inform him of his "right" to make a telephone call. He maintains that the statutory violation, in conjunction with the electronic recording of his statement, constituted an intentional plan to extract a confession. The defendant also contends that the motion judge erred in relying on his prior arrest history, including his prior exercise of his statutory right to make a telephone call; this history, the defendant asserts, has no bearing on the question whether the officers intentionally violated the statute.

We have concluded previously that a finding that a violation of § 33A was unintentional may be supported by evidence that officers informed a defendant of other rights. See, e.g., Walker, 466 Mass. at 278-279 ("The judge's reliance on the fact that the [officers] informed the defendant of . . . other rights is not misplaced, nor was the judge's consideration of the defendant's prior experience in the criminal justice system"). We also have concluded that, where the defendant previously has been informed of his right to a telephone call because, inter alia, the defendant has "prior experience in the

criminal justice system," the motion judge's consideration of the prior experience in determining whether to impose the exclusionary remedy is apt.  See id.  See also Commonwealth v. Leahy, 445 Mass. 481, 490 (2005) (where defendant "told the investigating officer that he knew his rights and had been arrested before" and defendant previously was seated across from large poster explaining telephone rights, "it was reasonable for the officer to assume that [the defendant] was well aware of his right to make a telephone call").

The defendant points to nothing in the record to support his contention that the violation was intentional, let alone that it was part of an illicit scheme.[13]  Contrast Jones, 362 Mass. at 500 (applying exclusionary rule to preclude admission of defendant's statement where defendant was not allowed to make telephone call despite repeatedly asking for opportunity).  A detainee's rights under § 33A are important.  See, e.g., Commonwealth v. Bradshaw, 385 Mass. 244, 266 (1982), and cases cited.  However, without more than the fact of the violation itself, the defendant has not carried his burden to show that

---

[13] The defendant's additional reliance on the electronic recording of his statement is misplaced.  As discussed supra, the record shows the defendant was given Miranda warnings, waived them, and understood that his voluntary statement was being preserved.

the motion judge clearly erred in finding that the officers' conduct was not intentional.

b. Prosecutor's comments on defendant's omissions. During the redirect examination of one of the police officers who had conducted the defendant's interrogation, the prosecutor asked, "During [the defendant's] lengthy interview with you, did the defendant ever say he saw a gun in the car that night?" The investigator answered that he had not. Then, during her closing statement, the prosecutor referenced this testimony, stating:

"At that point in time [the victim] doesn't point a gun at him, doesn't shoot at him, doesn't threaten him, nothing; and you know that because the defendant says none of that in his statement. He has the opportunity there in the statement to tell everything."

"The police practically beg him, tell us everything you can to help you. Tell us every detail. They even at the end say, you know, we're going to go do booking but if you think of anything, we can come back. Tell us everything. He never says that [the victim] pointed a gun at him or threatened him or that he saw a gun." (Emphases added.)[14]

---

[14] During the interrogation, the defendant did not say that he saw the victim with a gun, but he did say that the victim "was a shooter," was "making motions," and was "acting kinda funny like he got somethin' or somethin' . . . actin' like he had a weapon." Toward the end of the interrogation, one of the investigators stated, "Tell me what we don't know. Tell me what we didn't ask you that we should've asked you." The investigator asked multiple times whether there was anything the defendant wanted to "add or subtract" to his story or otherwise change, then or after booking. It is a reasonable inference that, if the defendant had seen the victim with a firearm, he would have said so, rather than limiting his account to these statements. See Commonwealth v. Doughty, 491 Mass. 788, 799 (2023), quoting Commonwealth v. Joyner, 467 Mass. 176, 189

The defendant contends that these statements violated his privilege against self-incrimination, protected by the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.  The Commonwealth maintains that, because the defendant waived his Miranda rights and decided to proceed with the interrogation, it was not improper for the prosecutor to identify inconsistencies between omissions during the post-Miranda interview and the trial defense.[15]  The defendant did not object to either the direct examination testimony of the officer or the closing statement; accordingly, we review to determine whether either was improper and, if so, whether it created a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Alemany, 488 Mass. 499, 511 (2021).

"'A defendant's silence after the police have given the warnings mandated by Miranda v. Arizona, 384 U.S. 436, 467-479 (1966), may not be used against the defendant' to impeach an

---

(2014) ("a prosecutor may argue reasonable inferences from the evidence").

[15] In opening, the defense counsel contended that, based on certain facts to be introduced in evidence, such as the victim asking a friend to hand him something, the jury should ask, "Was there a gun in the car?"  And in closing, the defense counsel argued that the police investigation was "a very shoddy way to look for evidence of a gun in that car," and again focused on the victim asking his friend to pass him something and putting his hand in his pocket, inferring that the victim had a gun.

exculpatory explanation subsequently offered at trial." Commonwealth v. Guy, 441 Mass. 96, 103 (2004), quoting Commonwealth v. Waite, 422 Mass. 792, 797 (1996). See Doyle v. Ohio, 426 U.S. 610, 619 (1976) ("the use for impeachment purposes of [defendant's] silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause"). However, where a defendant voluntarily chooses to speak to police officers and waives his Miranda rights, "[w]hat the defendant thereafter [chooses] to say or not say to each officer on the subject [can] properly be commented on by the prosecutor to expose inconsistencies." Guy, supra at 104. "A defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or demerits, and not on some artificial standard that only the part that helps him can be later referred to." Id. at 104-105, quoting United States v. Goldman, 563 F.2d 501, 503 (1st Cir. 1977), cert. denied, 434 U.S. 1067 (1978). Cf. Commonwealth v. Belton, 352 Mass. 263, 270, cert. denied, 389 U.S. 872 (1967) ("The remark complained of was not in effect directed at the defendant's silence while under arrest but rather at an inconsistency in his alibi which had been brought out during the trial").

The defendant does not now dispute that he voluntarily waived his Miranda rights.[16]  Accordingly, the prosecutor permissibly commented on the inconsistency between the defendant's position at trial that the victim had a firearm and that the defendant acted in self-defense, on the one hand, and his statement to the interrogating police officers that he believed the victim was armed based only on his knowledge of the victim and the victim's movements prior to the shooting, on the other.

The defendant misapprehends our decision in Commonwealth v. Haas, 373 Mass. 545, 559 (1977), S.C., 398 Mass. 806 (1986). There, we held that the defendant's failure to volunteer that he was innocent could not be used against him to imply tacit admission of guilt.  Id. at 559-560.  We have distinguished "asking the jury to infer guilt from the fact that a defendant had not spontaneously volunteered his innocence during an interrogation" from commenting on omissions in the defendant's statement to officers.  See, e.g., Commonwealth v. Thompson, 431 Mass. 108, 118, cert. denied, 531 U.S. 864 (2000), citing Haas,

---

[16] The defendant pressed this argument below, but has dropped it on appeal, and for good reason.  His primary challenge to the validity of the Miranda waiver was that he was only advised that he was under arrest on his probation warrant, but the motion judge found that he was informed that he was under arrest for murder as well, and there is nothing in the record to suggest that the finding was clearly erroneous.

supra at 558-559 ("proper for the prosecutor to comment on the fact that the defendant did not ask appropriate questions" about what had happened to victim, his wife, during "far-ranging statement"). A prosecutor may comment on "the fact that the defendant did not inform the police at any time of certain important details of [his story] which was presented at trial," where the defendant told some details to the police. Belton, 352 Mass. at 270.[17] "The defendant had a constitutional right to silence, not a right to tell a story and then avoid explaining crucial omissions by stating they were an exercise of the right

---

[17] Nor are we persuaded that the reasoning of Commonwealth v. Rivera, 62 Mass. App. Ct. 859, 862 (2005), cited by the defendant, suggests a different holding. See id. ("The defendant certainly was under no burden spontaneously to volunteer potentially exculpatory information in his statement to police"). There, the prosecutor commented on the defendant's failure to mention during his interrogation that there were witnesses to the event; not mentioning witnesses during the interrogation was not inconsistent with presenting witnesses at trial. Id. By contrast, here, the defendant specifically told officers that he believed that the victim was armed based on the victim's prior statements and his movements in the car; he did not mention, as a basis for his belief that the victim was armed, that he actually saw that the victim carrying a firearm. At trial, the defendant's position was that one of the reasons he thought the victim was armed was that the victim actually had a firearm. The prosecutor's comment on the inconsistency was fair. See Commonwealth v. Lodge, 89 Mass. App. Ct. 415, 419 (2016) ("Contrary to the defendant's claim, because the defendant waived his right to remain silent, and made a voluntary statement about the [issue], the concerns outlined in [Haas] do not apply here").

to silence." <u>Commonwealth</u> v. <u>Sosa</u>, 79 Mass. App. Ct. 106, 113 (2011).

c. <u>Review under G. L. c. 278, § 33E</u>. After a review of the entire record, we discern no error warranting relief under G. L. c. 278, § 33E.[18]

3. <u>Conclusion</u>. We affirm the defendant's convictions of murder in the first degree and unlawful discharge of a firearm within 500 feet of a building. We vacate and set aside the defendant's conviction of unlawful possession of a firearm.[19] The defendant's motion for a new trial is denied.

<u>So ordered</u>.

---

[18] We have considered the additional arguments in the defendant's brief filed pursuant to <u>Moffett</u>, 382 Mass. at 207-208, and we conclude that they do not warrant granting his motion for a new trial.

[19] "[T]he defendant's rights under the Second Amendment [to the United States Constitution] and his rights to due process were violated when he was convicted of unlawfully possessing [a firearm] although the jury were not instructed that licensure is an essential element of the crime." <u>Guardado</u>, 491 Mass. at 693. "[O]ur holding [in <u>Guardado</u>] applies prospectively and to those cases that were active or pending on direct review as of the date of the issuance of [<u>New York State Rifle & Pistol Ass'n</u> v. <u>Bruen</u>, 142 S. Ct. 2111 (2022)]." <u>Guardado</u>, <u>supra</u> at 694. As to whether retrial shall be permitted, that issue is currently pending before the court and is scheduled for oral argument in September 2023. See Commonwealth <u>vs</u>. Guardado, No. SJC-13315. The rescript in this opinion shall be stayed pending our decision in that case.

BUDD, C.J. (concurring).  I agree that the motion judge was correct to deny the defendant's motion to suppress and that the defendant's convictions should be affirmed.  I write separately because, in my view, the plain and unambiguous language of the wiretap statute, G. L. c. 272, § 99 B 4 (§ 99), should apply even where police officers adhere to other legal requirements, such as providing a Miranda warning.  Applying the plain statutory language in this case, I conclude that the officers violated § 99.  Nevertheless, because the officers did not deliberately record the defendant without his knowledge during his confession, his statements need not be suppressed.

1. <u>Interpretation</u>.  Subject to limited, enumerated exceptions,[1] § 99 proscribes the secret recording of "the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given

---

[1] In summary, the act contains exceptions for (1) employees or agents of common carriers, (2) persons possessing or using an intercommunication system in the ordinary course of their business, (3) United States investigative and law enforcement officers acting pursuant to the laws of the United States and within the scope of their authority, (4) any person authorized by warrant to make interceptions, (5) investigative or law enforcement officers acting to ensure the safety of another officer or agent who is undercover or serving as a witness for the Commonwealth, (6) financial institutions communicating with their corporate or institutional trading partners in the ordinary course of business, and (7) law enforcement officers investigating certain offenses in connection with organized crime.  See G. L. c. 272, § 99 B 4 & 7, D.  Neither the Commonwealth nor the court asserts that any of the statute's exceptions apply in this case.

prior authority by all parties to such communication" (emphasis added).  G. L. c. 272, § 99 B 4.  See Commonwealth v. Jackson, 370 Mass. 502, 503 n.1 (1976), S.C., 391 Mass. 749 (1984).  If none of the enumerated exceptions applies, "any person" includes law enforcement.  See Commonwealth v. Burgos, 470 Mass. 133, 140 (2014) (noting that law enforcement may record with only one-party consent when investigating certain designated offenses in connection with organized crime).  "Intercepting device" is defined as "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication."  G. L. c. 272, § 99 B 3.  As we observed in Curtatone v. Barstool Sports, Inc., 487 Mass. 655, 658 (2021), the statute does not define "secretly."  We therefore adopt its plain language meaning, which includes "something kept hidden or unexplained."  Id., quoting Merriam-Webster's Collegiate Dictionary 1122 (11th ed. 2020).

With the all-party consent provision and the act's applicability to "any person," including law enforcement officials unless authorized, the Legislature has placed tight controls on secretly recording oral communications.  Accordingly, this court has both consistently underscored the act's broad prohibition against secretly recording conversations except as authorized by the statute and maintained that the relevant inquiry under § 99 is whether individuals being

recorded "have actual [or constructive] knowledge of the recording," which may be "proved where there are clear and unequivocal objective manifestations of knowledge" in the speakers' statements or conduct.  Jackson, 370 Mass. at 507. See, e.g., Curtatone, 487 Mass. at 657-658; Commonwealth v. Moody, 466 Mass. 196, 208-209 (2013) (noting broad definition of "interception" under § 99); Commonwealth v. Tavares, 459 Mass. 289, 297 (2011) ("clear legislative intent" to limit availability of wiretapping in criminal investigations); id., quoting Commonwealth v. Thorpe, 384 Mass. 271, 279 (1981), cert. denied, 454 U.S. 1147 (1982) ("we have stated that the one-party consent exception is 'a narrow exception to the broad statutory prohibition against warrantless surveillance'").  See also Tavares, supra, quoting Thorpe, supra ("Legislature proceeded on the premise that electronic surveillance is anathema except within certain narrowly prescribed boundaries").  It is undisputed that the defendant did not have actual or constructive knowledge that he was being recorded.  Given the language of the statute, and our prior precedent interpreting it, this finding is sufficient to conclude that an interception was made.

As a practical matter, a textual application of the statute in this case simply would mean that an individual being questioned by police must be given actual or constructive notice

that he or she is being audio recorded (even where the individual is aware that officers are taking notes and officers have provided a Miranda warning). See Commonwealth v. Hyde, 434 Mass. 594, 605 (2001) (no violation of § 99 occurs when recording is done in plain view even if actual notice is not given).[2]  As this result is not illogical, we need not attribute intent to the Legislature where the statutory language speaks for itself.  See Worcester v. College Hill Props., LLC, 465 Mass. 134, 138 (2013) (where statutory language is clear and unambiguous, it is conclusive as to legislative intent and should be enforced unless application would lead to absurd result); Commissioner of Correction v. Superior Court Dep't of the Trial Court for the County of Worcester, 446 Mass. 123, 124 (2006) (where statutory language is clear and unambiguous, our

---

[2] The United States Court of Appeals for the First Circuit has held that the application of the act to prohibit secret recording of police in carrying out their public duties violates the First Amendment to the United States Constitution.  See Project Veritas Action Fund v. Rollins, 982 F.3d 813, 833-840 (1st Cir. 2020), cert. denied, 142 S. Ct. 560 (2021) (Project Veritas).  However, this conclusion was specific to the context of civilians recording police officers in the performance of their public duties.  See id. at 831, quoting Glik v. Cunniffe, 655 F.3d 78, 85 (1st Cir. 2011) (citation omitted) ("the [F]ederal constitutional guarantee of freedom of speech protects the right to record 'government officials, including law enforcement officers, in the discharge of their duties in a public space,' even when the recording, which there involved both audio and video, is undertaken without the consent of the person recorded").  See also Project Veritas, supra at 836-840. The analysis in Project Veritas does not apply here, where the subject of the secret recording is not a government official.

inquiry ends). In fact, advising suspects that their interview is being recorded is standard practice. See Commonwealth v. Alleyne, 474 Mass. 771, 785 (2016) (citing § 99 B 4, C 1, in clarifying that "[p]ermission to record an interview is not required so long as the interviewee has actual knowledge of the recording"); Commonwealth v. DiGiambattista, 442 Mass. 423, 445 (2004) (citing § 99 in noting suspect may refuse to allow recording).[3]

Nor does Commonwealth v. Gordon, 422 Mass. 816 (1996), counsel us to go beyond the text in this case. In Gordon, we held that the videotaping of the defendants' booking at a police station did not violate § 99, even though the defendants had no knowledge of the taping. Id. at 832. In reaching that conclusion, we alluded to the act's "legislative focus . . . on the protection of privacy rights and the deterrence of interference therewith by law enforcement officers' surreptitious eavesdropping as an investigative tool." Id. at 833. With that context in mind, we decided that the Legislature did not intend the act to apply to the recording of an administrative booking, where the "videotape did not capture or reveal the defendants' thoughts or knowledge about some fact or

---

[3] Indeed, an officer in this case testified that it is good practice for the police to inform those being interviewed that they are being recorded.

subject, but at best served only to exhibit the defendants' bearing and manner of speaking which were relevant on the question of their intoxication or sobriety at the time of the assaults" in question.  Id.  But Gordon readily is distinguishable from the present case because, here, the defendant's interrogation, not his booking, was recorded, and the recording plainly did capture the defendant's thoughts or knowledge about a fact or subject, namely, his actions, state of mind, and other circumstances during the night of the murder.  Moreover, neither Gordon nor any of the cases decided since suggests that we intended to overrule Jackson.  Instead, our decisions have continued to follow Jackson in focusing on whether a speaker has knowledge of the recording as the standard for determining whether a recording has been made "secretly" in violation of the act.  See, e.g., Curtatone, 487 Mass. at 659 (defendant did not secretly record telephone call in violation of act, where plaintiff knew that he was being recorded); Commonwealth v. Boyarsky, 452 Mass. 700, 705-706 (2008) (recording that is made with actual knowledge of all parties is not "an interception" under § 99); Hyde, 434 Mass. at 600-601 (where no exceptions apply, recording made without knowledge or consent of all parties violates act even if no reasonable expectation of privacy).

2.  <u>Contemporaneous note-taking</u>.  For its part, the Commonwealth argues, and the court agrees, that because the defendant was aware that the officers were taking notes on his statement, and that his words could be used against him in court, the recording of the defendant's interview does not amount to the kind of "surreptitious eavesdropping" prohibited by § 99.  However, nowhere does the statute state, or even imply, that memorializing speech through a nonintercepting method, such as pen and paper, creates latitude to contravene the statute's prohibition on memorializing speech through the use of an intercepting device without notice.

The statute broadly defines "intercept" as to "secretly hear" <u>or</u> "secretly record."  G. L. c. 272, § 99 B 4.  There is no doubt that the defendant was aware that he was being heard by the officers who were present and that his words were being memorialized through pen and paper.  However, it also is uncontested that the defendant neither was informed nor otherwise made aware that he was being recorded.  To determine that there is no "interception" where the "hearing" is not secret, but the recording is, ignores the phrase "to record" included in the definition of "interception."  See <u>Commonwealth</u> v. <u>Daley</u>, 463 Mass. 620, 623 (2012) ("In statutory interpretation, '[n]one of the words of a statute is to be regarded as superfluous'" [citation omitted]).  Thus, the

statute apparently contemplates circumstances in which one openly hears a conversation and secretly records it through the use of an intercepting device.  Such conduct is a violation of the statute based on its plain language.

Although strict, the Legislature passed one of the most stringent wiretap statutes in the nation by design.  See Hyde, 434 Mass. at 599 n.5 (discussing other States' wiretap laws); Jackson, 370 Mass. at 506 & n.6.  The preamble evinces this strictness by highlighting two concerns of the Legislature's that it attempted to balance in enacting the wiretap statute: (1) law enforcement's ability to use "modern methods of electronic surveillance, under strict judicial supervision," to investigate organized crime and (2) protecting "the privacy of all citizens of the commonwealth."  G. L. c. 272, § 99 A; Commonwealth v. Ennis, 439 Mass. 64, 68 (2003).

To effectuate this balance, the statute details the very limited circumstances in which law enforcement may record a member of the public without his or her knowledge or consent. See Hyde, 434 Mass. at 599 ("The commission clearly designed the 1968 amendments to create a more restrictive electronic surveillance statute than comparable statutes in other States"). Again, neither the Commonwealth nor the court contend that any of these circumstances are present in this case.  Bearing in mind the broad coverage of § 99 and the narrowness of its

exceptions for law enforcement activities, we should not infer that the Legislature intended to exempt police officers from informing a member of the public that they are being recorded so long as the officers adhere to other, unrelated legal directives.

In accordance with our prior precedent, in determining whether the recording of the defendant's interrogation in this case was made "secretly" in violation of § 99, we should focus on whether the defendant knew that his interrogation was being recorded. The motion judge's findings that the defendant was not advised and did not have constructive notice of the recording have not been challenged. Thus, absent evidence of clear error, these findings conclusively should establish that the recording was made in violation of the statute.

3. Remedy. Although I conclude the interview was intercepted, as the term is defined in § 99, the statute "does not . . . require the suppression of all communications intercepted in violation of its provisions." Commonwealth v. Santoro, 406 Mass. 421, 423 (1990). As "[t]he Legislature has left it to the courts to decide whether unlawfully intercepted communications must be suppressed," id., I would affirm the motion judge's decision to deny the defendant's motion to suppress, as the court does today.

Exclusionary rules "are intended to deter future police conduct in violation of constitutional or statutory rights." Id. As such, this court has had occasion to affirm the denial of a motion to suppress recordings made in violation of the act where no deterrent purpose would be served by requiring suppression. See id. As one of the officers testified at trial, it was standard practice to inform those being interviewed that they were being recorded, and he had done so with another witness whom he had interviewed in the case.

Moreover, as the court notes, the motion judge found that the officers promptly had reviewed the defendant's Miranda and arraignment rights with him at the outset of the interview. Additionally, it is undisputed that, after being given his Miranda warnings, the defendant openly admitted to firing two shots into the car window where the victim was sitting, and the defendant does not contend on appeal that his confession was coerced. No deterrent purpose would be served by granting suppression in these circumstances.[4]

---

[4] While § 99 defines "interception" as secretly hearing or recording the contents of any wire or oral communication through the use of any intercepting device, the act only penalizes individuals who commit willful interceptions. See G. L. c. 272, § 99 B 4, C 1. As there is nothing to suggest that the officers in this case willfully recorded the defendant without his knowledge, they would not be subject to § 99'ssignificant penalties, which further supports the contention that no absurd result would come from adhering to the statute's plain text in

this case.  See Commonwealth v. Brennan, 481 Mass. 146, 154
(2018) ("Wilful conduct is that which is 'intentional rather
than accidental . . .'" [citation omitted]).